# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
LOUIS MITCHELL, JR.,
Defendant and Appellant.

S147335

San Bernardino County Superior Court
FSB051580

June 24, 2019

Justice Liu authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

PEOPLE v. MITCHELL

S147335

Opinion of the Court by Liu, J.

A jury in San Bernardino County convicted defendant Louis Mitchell, Jr., of three counts of first degree murder of Mario Lopez, Patrick Mawikere, and Susano Torres (Pen. Code, § 187, subd. (a); all undesignated references are to this code), and three counts of first degree attempted murder of Juan Bizzotto, Jerry Payan, and Armando Torres (§§ 664, 187, subd. (a)), arising from two shootings committed by Mitchell on August 8, 2005. The jury found true special circumstance allegations that Mitchell committed multiple murders and the enhancements that in each offense Mitchell personally and intentionally discharged a firearm. (§§ 190.2, subd. (a)(3), 12022.53, subd. (d).) The jury returned a verdict of death. The trial court then sentenced Mitchell to death for the three counts of conviction of first degree murder and imposed an additional sentence of 150 years to life in prison for the three counts of conviction of first degree attempted murder and the firearm enhancements. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) We affirm the judgment in all respects.

## I.  FACTS

### A.  Guilt Phase

#### 1.  *Prosecution Evidence*

##### (a)  Mitchell and Small's Visit to Car Dealership on August 8, 2005

In August of 2005, Mitchell and Dorene Small were living together in an apartment in Rialto, along with Small's five children and three of Mitchell's children.  Small had recently been in a car accident and received a settlement from her insurance company.  She intended to use the settlement proceeds to buy another car.

On August 8, 2005, after Small picked up the settlement check from her insurance company, she and Mitchell went to California Auto Specialist (CAS), a used car dealership in Colton, to shop for a replacement vehicle.  They arrived at CAS between 10:00 and 10:30 in the morning in Small's white Chevrolet Lumina.  Small testified that although she owned the Lumina, it was often driven and used by Mitchell.

At first, they were helped by CAS salesman Juan Bizzotto.  Because Bizzotto could not speak English well, he referred them to his colleague, Mario Lopez.  Ultimately, Lopez helped Small complete paperwork to purchase a used Dodge Durango truck.  According to the testimony of another CAS salesman Jerry Payan, it appeared that Mitchell tried to dissuade Small from buying the Durango because he preferred a larger truck.  But Small did not like the bigger truck, and her poor credit status prevented her from qualifying for the more expensive truck that Mitchell preferred.

Mitchell left CAS, leaving Small to finalize the car purchase with Lopez on her own.  There was conflicting

testimony as to Mitchell's demeanor when he left Small. Payan recalled that Mitchell was angry with her over her choice. Bizzotto, on the other hand, remembered Mitchell acting "fine" during the deal, despite his disagreement with Small's decision.

Small then told Lopez that she needed to cash a check at a bank in order to make the downpayment. Lopez agreed to allow Small to drive the Durango to the bank, and Bizzotto followed Small in a separate car. On the way back to the dealership, the Durango broke down and could not be restarted. They left the Durango on the side of the road for repairs, and Bizzotto drove Small back to the dealership.

Small testified that she was not upset about the breakdown of the Durango, and Bizzotto confirmed in his testimony that Small had reacted calmly. According to Bizzotto, Small went ahead with the purchase of the Durango, even though she had the right to back out of the deal. Small chose to take a loaner car and allow the dealership to fix the Durango. While still at the dealership, Small called home to tell her son Kenrod Bell that she had bought a car but was not coming home with it because it broke down.

When Small arrived home, Mitchell was not there, and she did not see her Chevy Lumina. Small noticed that Mitchell had left his cell phone, which was unusual for him. Small then left for work, arriving there around 2:30 p.m. But she left shortly thereafter because she was not feeling well, and she returned home around 4:00 p.m.

Around 2:00 p.m., Mitchell called Christina Eyre, who at the time of trial was Mitchell's girlfriend. Eyre testified that she and Mitchell had been in a relationship for about two years, including the time that Mitchell was together with Small. Their

conversation lasted less than five minutes. Mitchell mentioned to Eyre that he and Small had been "screwed over" in a car deal; according to Eyre, Mitchell did not say he was mad, but noted that Small had insisted upon buying the defective Durango. Eyre further stated that she heard Romen Williams, also known as "Chrome," and Small's son Bell in the background.

### (b) Shooting at the Car Dealership

Between 2:15 p.m. and 2:30 p.m. on August 8, 2005, Payan, Lopez, and Patrick Mawikere were gathered at Payan's desk facing the window overlooking the car lot. They saw Mitchell return to the dealership driving the same white Lumina in which he and Small had arrived earlier that day. Bizzotto, who was on his desk phone talking with his wife at the time, also noticed Mitchell. Bizzotto saw that Mitchell was not alone; he was accompanied in the Lumina by two other people. Bizzotto described the two as African American men between 25 and 35 years of age; they remained in the car as Mitchell entered the dealership.

There were no customers in the dealership at the time. Payan and Bizzotto both testified that they saw Lopez meet Mitchell at the entrance of the dealership office. Mitchell repeatedly asked Lopez where Small was. Lopez replied that Small had left to go to work. Both Payan and Mawikere stood up, intending to assist Lopez. Although Payan was not alarmed by Mitchell's behavior at this time, Bizzotto testified that Mitchell was excited and angry, in contrast to his behavior earlier that day.

Payan then saw Mitchell pull a gun out of his pants pocket and shoot Lopez. Payan testified that Mitchell was looking at Payan while he shot Lopez. When Payan heard a second

gunshot, he ran toward a window looking to escape. Because Mitchell was standing in front of the only exit, Payan decided to escape by jumping through the closed window. Before he crashed through the window, Payan heard two or three more gunshots and was shot in the right arm. Payan landed between two large cars parked outside the office and crouched between them. Mitchell pointed his gun outside the window and shot at him. Payan heard one or two more gunshots, but he was not hit. As he continued to crouch between the two cars, Payan heard another series of gunshots coming from inside the dealership. He also noticed that Mitchell's white Lumina was in front of him, with a man sitting in the front seat. Payan made eye contact with him, and the man exited the Lumina. According to Payan, the man was a tall, thin African American man, perhaps 18 or 19 years old. Payan saw that this man had his hand down by his side, and it looked like he had a gun. Payan then ran across the dealership lot and across the street, seeking help. Payan ultimately caught the attention of an ambulance and was given medical assistance on the street before being transported to a hospital.

Bizzotto testified that he saw Mitchell push Lopez back from the front door of the dealership as Lopez was attempting to escort him outside, pull out a gun, and shoot Lopez in the abdomen. Bizzotto then saw Payan jump through a window while Mitchell shot at Payan. When Mawikere tried to intervene, Bizzotto saw Mitchell point his gun at Mawikere, and Mawikere asked Mitchell not to shoot him. Mitchell then shot Mawikere in the head and turned toward Bizzotto. Bizzotto attempted to hide underneath his desk, and Mitchell started shooting at him. Bizzotto was shot in the right arm and the right thigh. Mitchell fired another seven times at Bizzotto,

causing Bizzotto to suffer shrapnel wounds to his left leg. After he heard two additional shots, the sound of the door opening, and a car being driven away, Bizzotto emerged from underneath his desk. He saw that Lopez was injured and told him to remain calm. He saw that Mawikere had been shot and was unresponsive. Bizzotto instructed his wife, who was still on the phone, to call 911. Bizzotto also called 911 himself.

John Vasquez was driving by the dealership around 2:30 p.m., when he saw Bizzotto come out of the dealership with blood running down his arm. He testified that Bizzotto was staggering and being assisted by another man who was holding his arm up. Vasquez noticed a broken window and thought that Bizzotto had fallen through it, so he stopped to offer help. Bizzotto told Vasquez that he had been shot by two black men and that he feared for his life.

Responding to the 911 calls, officers from the Colton Police Department arrived at CAS at approximately 2:45 p.m. They found that a window in front of the dealership office had been smashed, and there was a trail of blood outside the window leading south toward the street. Officers encountered Bizzotto outside the dealership and saw that he had been shot in the arm. Bizzotto told them that the person responsible was a black man who had been at the dealership earlier that day to buy a black Durango. Inside the office of the dealership, officers found Lopez lying on the floor on his back, near the front door. Lopez was conscious and in pain from two gunshot wounds but able to relate that a lone black man, who had arrived in a white 1997 Chevy Lumina, had shot him. The officers then found Mawikere behind a desk, dead and facedown with a gunshot wound to the

head. Lopez died later that night at the hospital as a result of three gunshot wounds.

The police interviewed Payan and Bizzotto at the hospital where they were being treated for their injuries. Payan was shown photo displays of two suspects. At first, Payan was unable to cooperate because he was under the influence of morphine. Thereafter, Payan identified a photograph of Mitchell as the shooter. Bizzotto was physically unable to talk to the officer who visited him at the hospital. After his discharge from the hospital, Bizzotto was shown a display of six photographs and identified Mitchell's photograph as the person who shot him.

### (c) Shooting at the Yellows Apartment Complex

The Yellows was the colloquial name given to an apartment complex in San Bernardino. On August 8, 2005, around 3:00 p.m, Armando Torres was at the complex visiting his mother and his brother Susano Torres. Mitchell had previously lived at the complex and still visited it frequently. Armando and Susano knew Mitchell from around the complex and had not had any problems with him.

On his way to a friend's apartment, Armando saw Susano speaking to Rita Ochoa through the window of her apartment. Armando told Susano that their mother was looking for him. Armando then went to his friend's apartment, where he smoked methamphetamine.

As Armando came out of his friend's apartment, Mitchell walked towards him and said, "Hey devil, let me talk to you," and repeatedly told Armando to "come here." Armando had an unusual tattoo of horns on his head. Armando testified that Mitchell appeared to be upset. Armando asked what Mitchell

wanted, and Mitchell demanded that Armando come to him. Armando refused and Mitchell pulled out a gun and said, "You fucked up." Mitchell shot at Armando at least three times, hitting him once in the leg as a woman managed to pull him inside her apartment and call 911. Armando stated that he heard more shots fired about 30 seconds later.

Susano was joined by his friend Phillip Mancha, and they were talking to Ochoa outside her window when they heard shots. Mancha climbed through Ochoa's window, and he and Ochoa got down on the ground. Susano went to check what was happening and encountered Mitchell. According to the testimony of another resident of the Yellows, Valerie Hernandez, Mitchell shot Susano. He was with Romen Williams, and one of them said something to the effect of "[f]uck that. That's what they get." Hernandez could not see Mitchell's face because it was obscured by the leaves of a tree in her line of sight, but she saw his body and a gun in his hand when the shots were fired. Then after the shots were fired, she saw Mitchell pull down the gun to his side and walk away between the apartments toward the parking area. Mancha testified that he heard Susano getting hit and yelling for help. Ochoa testified that she looked outside and saw Susano on the ground bleeding from the nose. The bullet passed through both of Susano's lungs, and he died shortly thereafter from internal bleeding. Neither Ochoa nor Mancha identified Susano's shooter.

Just before 3:00 p.m., Rosalba Villaneda, Armando's sister-in-law and a resident of the Yellows, heard several gunshots being fired. She testified that about five minutes later, Mitchell walked by them with a gun in his right hand, unaccompanied. Although Villaneda did not know him by name,

she was familiar with Mitchell. Mitchell then entered a car on the passenger side and left the area.

Shortly thereafter, San Bernardino police officers arrived at the Yellows to respond to the incident. Officer James Voss saw a group of people by Torres, who was lying in a dirt area with no pulse. Voss called for medical assistance. A resident of the Yellows then directed Voss to her apartment, where he found Armando on the floor.

### (d) Mitchell's Arrest

On the next day, August 9, 2005, Mitchell went to the Del Mar apartment complex in San Bernardino. He was at Tracy Ruff's apartment, where he and another person were smoking marijuana and cigarettes. Suddenly, Mitchell pulled out his gun and fired it into the air six or seven times. Then Mitchell walked out in front of the apartment complex, waving his gun in the air. A nearby resident, Patricia Conger, saw Mitchell pointing his gun at other cars, people, and houses. Around the same time, another nearby resident, James Morrison, was outside his house working on a car and heard several gunshots. He then saw Mitchell waving a gun, so Morrison ran into his house.

Ruff followed Mitchell to the street and saw Mitchell wave his gun in the air and say, "I killed the devil." Ruff told Mitchell that the police were going to come and asked Mitchell to give him the gun. Ruff returned to the apartments and hid the gun in the tire well of a van in the rear parking structure.

Officer Thomas Adams arrived on the scene, and Mitchell immediately started yelling at him. Officer Adams testified that he made numerous commands that Mitchell ignored. Instead of complying, Mitchell kept approaching the officer and said, "My gun is bigger than yours. Fuck it. I'll just take your gun."

Officer Adams then shot Mitchell in the leg to stop him from advancing.

Officer Kevin Jeffery testified that Mitchell was agitated when officers were handcuffing him and in the ambulance on the way to the hospital. During this time, Mitchell told Officer Joshua Cogswell that if he was going to die, the officer was going to go with him. He also told Officer Jeffery, "God would not judge him for killing the devil."

(e) Forensic Evidence

Criminalist Heather Harlacker located one fired cartridge case outside the CAS office building and 10 more fired cartridge cases and bullet fragments inside the building. According to Harlacker's expert testimony, all 11 cartridge casings were from the same nine-millimeter caliber gun. Seven cartridge casings, all nine-millimeter casings of the same brand, and nine bullet fragments were collected at the Yellows. At the Del Mar complex crime scene, a forensic technician recovered a nine-millimeter gun containing an empty magazine concealed in the wheel well of a van, with Mitchell's DNA on it. Criminalist Kerri Heward concluded that six of the seven cartridge casings had definitely been fired from the same nine-millimeter gun retrieved, and the other cartridge probably was. The technician also recovered a second empty nine-millimeter magazine inside the pocket of Mitchell's pants. Furthermore, Heward opined that the casings recovered from the car dealership, the Yellows, and the Del Mar complex were all fired from Mitchell's gun.

2. *Defense Evidence*

The defense case focused on inconsistencies in the witness's testimony and the lack of scientific evidence. Defense

counsel argued that Payan's account of Lopez's death conflicted with the medical examiner's findings. Counsel challenged the credibility of Armando's testimony on account of the fact that he was under the influence of methamphetamine and his brother was killed, and additionally pointed out inconsistencies in his recitation of the facts. Counsel also challenged Hernandez's recitation of the facts as inconsistent. Finally, defense counsel underscored that the bullets recovered from the victims could not be matched to the casings at the crime scenes and to Mitchell's gun.

## B. Penalty Phase

### 1. *Prosecution Evidence in Aggravation*

#### (a) Criminal Activity Involving Force or Violence

##### (1) July 10, 1998 Carjacking

The prosecution presented evidence that Mitchell was involved in a carjacking on July 10, 1998. Around 5:30 p.m. on that day, Rebecca Davis and Lupe Chavez were parked at a store in San Bernardino, talking to each other. Chavez was in the driver's seat, Davis was in the passenger seat, and Davis's infant daughter was sitting in between them. Davis noticed two black males talking to each other. One of them approached the driver's side, and the other, Mitchell, approached the passenger's side of the car. The man on the driver's side was wearing brass knuckles and told Chavez to get out of the car. When she refused, he pulled her out of the car and she fell to the ground. Mitchell told Davis to get out and get her baby out of the car, and she complied. The men then drove away in the car.

##### (2) August 9, 2005 Firing of Gun

The prosecution then presented evidence about the events at the Del Mar complex on August 9, 2005. Around 3:00 p.m.,

Mitchell was in the middle of 19th Street with a gun. Brenda Wierenga and David Roark were in a car on the street at the time. Wieranga saw Mitchell pointing a gun at her and ducked under the steering wheel. Mitchell fired the empty gun five to six times at the car's passenger side where Roark was seated. Mitchell made a number of threatening and racially charged statements at Wieranga and Roark, such as: "Hey, anybody want to come out here and fight me? We can get down right now"; "All you whites and Mexicans stay inside"; and "Where is all my n———?" As Wieranga drove the car away, Mitchell said, "See y'all don't want none." Mitchell then pointed his gun at the sky, took out the clip, and pointed it at his head and said, "See, I'll even shoot myself." He also said to himself, "Go back inside. You all need to go back inside. The devil is talking to me."

Armando DeSantiago, who worked for Federal Express, was delivering a package on 19th Street when he heard gunshots. He testified he saw Mitchell in the middle of the street pointing his gun indiscriminately and yelling, "I'm the devil. I'm going to shoot everybody. Just come out wherever you are." Mitchell saw DeSantiago, pointed the gun at him, said, "I'm going to kill you" and to "get out of there"; Mitchell then pulled the trigger three times from a short distance away. In fear, DeSantiago hid behind his truck.

Mitchell then went back inside the apartment complex and came back out. He was followed by Ruff telling him to calm down. Mitchell and Ruff struggled over the gun and finally Mitchell gave it to him. When the officer arrived, Mitchell walked toward the officer, pantomiming that he had a gun in his hand and was firing it. Mitchell said to the officer, "Come on, you're a cop. You're supposed to kill me." Mitchell was arrested

soon thereafter, and he told an officer to remove his handcuffs and said he would "kick his ass."

(b) Victim Impact Evidence

(1) Murder of Mario Lopez

Rene Lopez, one of Mario Lopez's four sons, testified about his father. Rene described Mario as a caring, happy man. He described Mario as "the best mechanic in the world. The best father. The best grandfather." Mario doted on his grandson and loved spending the holidays with Rene's family. He also loved spending time with his wife Cecelia.

Rene traveled to the hospital when he heard Mario was shot and stayed with him until he died. Since his father's death, Rene said there are "times I lose myself" when he goes through bouts of depression. Rene also misses the relationship his father had with his son.

Cecelia Lopez had been Mario's partner for nine years. She described Mario as a family man, always concerned about his children and grandchildren. She described him as a gentleman and very hardworking.

Since his death, Cecelia had to sell their house, move in with her daughter, and give up her two dogs. Cecelia said that what she missed most about Mario was his presence, his caring, and how he looked after her. For example, he used to remind her to take her medication. Furthermore, she testified that her medical problems have gotten worse since Mario was murdered due to high blood pressure and anxiety.

Payan had known Mario Lopez for over five years. He described Mario as always concerned about everybody else. He

missed Mario's advice and encouragement, like when Mario would tell him not to worry about the small things.

### (2) Murder of Patrick Mawikere

Several witnesses testified about the impact of Patrick Mawikere's murder on their lives. Patrick's father, John Mawikere, testified about his son. Patrick had an apartment with his brother Sandy, but often visited his parents on his days off. John testified that Patrick loved working and was very generous with his money. Patrick had a lot of friends; more than 1,600 people attended his funeral. Patrick loved to take his niece and nephew out. Patrick and his mother, Mary Mawikere, were very close; they spoke every day. Mary had to go to counseling to cope with Patrick's death. Payan testified that he had known Patrick for two years, and they became friends. He said Patrick was raised very well by his parents, was hard working, and had set a number of goals for himself.

### (3) Attempted Murder of Jerry Payan

Prior to being shot, Payan was a very active person. He testified that he has lost some function in his right arm and is still suffering from the injury to his knee. He testified that he was frustrated and angry because he could no longer do things like hug his wife, hold his children, and play sports with his son. Payan's wife, Doris Payan, described the changes in their lifestyle since the shooting. Instead of spending days off taking their son to the amusement park and doing other activities, they spent that time going to therapy. She further testified that Jerry was no longer the calm person he once was; he used to be jovial and joke with people, but he became easily agitated. He was also uneasy at home; he did not feel safe and often worried that he would not be able to protect her if something happened.

### (4) Attempted Murder of Juan Bizzotto

When Bizzotto was shot, he had one-year-old twins. He testified that the injury from his gunshot wound severely limited the use of his right hand and arm such that he could no longer lift his children or feed them with his right arm. Furthermore, Bizzotto's mental and emotional health was adversely affected by the shooting. He testified that he had trouble going out in public. Moreover, he was no longer able to work.

### (5) Murder of Susano Torres and Attempted Murder of Armando Torres

Rafaela Navarete testified about her sons, Susano and Armando Torres. She testified that Susano loved playing with her grandchildren and that he helped watch them. She said Susano was a happy child who loved to work with his hands; he liked to take things apart and put them back together. Navarete knew Mitchell, as he was friends with her children and would come by and ask for them. She testified that Mitchell even called her "mom." She was angry at Mitchell and did not understand why he killed Susano. As a result of the stress, she had to go to the hospital. Navarete thereafter moved from the Yellows complex. Following Susano's death, she went to the cemetery every day to visit him, where she cried and talked to him.

Sergio Quintero, Susano and Armando's older brother, also testified. At one point, Susano lived with Quintero in Redlands before Susano moved in with their mother. Quintero said Susano was his friend and they spent a lot of time hanging out together.

15

Beatriz Lopez, Susano's older sister, recalled that Susano was a good child. Whenever she went to their mother's house, Susano was often playing with the kids. She recalled that when she was cooking, Susano would come up from behind her, hug her, and say, "I love you, sis." She said that she misses everything about Susano and that they had a great relationship. She also testified that this last Christmas, her mother did not want to be with the family and instead spent time alone in her room.

Armando Torres testified that he missed Susano's smile, how Susano used to treat him, and the time they spent hanging out together. He said Susano was a nice person and a good kid. Armando had not returned to the Yellows since the shootings because he did not want to remember it. Armando testified that when he thought about his brother, he used drugs to make his thoughts go away. After the shootings, Armando's methamphetamine use became worse; he testified that he kept "messing up," resulting in further arrests. Armando testified that at the time of his testimony, he was in custody for criminal charges relating to an assault, possession of drugs, and possession of a firearm.

### 2. *Mitigation Evidence*

#### (a) Mitchell's Family and Childhood

Mitchell's mother, Kathy Joiner, was 16 years old when she married Mitchell's father, Louis Mitchell, Sr. Mitchell, the first of their three children together, was born in 1970. Mitchell's father returned from service in the Marines in 1971. Mitchell's parents had a tumultuous marriage and separated three times before their divorce in 1975.

Mitchell and his younger brother, Dante Mitchell, were ages six and five, respectively, when their father went to jail. Mitchell's uncle, John Mitchell, and his wife took Mitchell and Dante in and cared for them. They stayed with John for about four and a half months until the state placed them in the foster system. John described Mitchell's father as an "absentee dad," even to this day. John said that Mitchell's parents were both very young and inexperienced, and incapable of raising children. Joiner testified that she failed her son as a mother.

Dante Mitchell testified that when he was eight and Mitchell was ten, they lived with a couple named Matty and Big Jim until they moved back in with their father. Things began to deteriorate from there, and at their father's request, they went back into foster care. They were then returned to their mother in 1979 and, shortly thereafter, removed from her care when she was arrested for alleged child abuse and neglect. The last time Dante had seen Mitchell was on the morning of August 9, 2005. Mitchell came to Dante's house in Los Angeles just before Dante was leaving for work around 8:00 a.m. He told Dante that he looked like Mitchell's children and that he loved him.

Wendy Williams was Mitchell's stepmother but had been separated from Mitchell's father for about 22 years. She testified that Mitchell and Dante had lived with her and Mitchell, Sr., on two occasions for relatively short periods of time when they were younger. She further testified that Mitchell, Sr., had poor parenting skills and that he did not interact with any of his children. Williams last saw Mitchell when he was 17 years old.

17

Lashona Blue, with whom Mitchell has three children, also testified. Their children were 11-year-old twins Hasan and Amena, and eight-year-old Mustafa. Blue and Mitchell met in 1994 and lived together in Los Angeles for three to four years. She testified that Mitchell loved their children, was a good father, and never abused her in any way. Blue said she had some great times with Mitchell and their children, and that he was never vicious. She stated that her sons were having problems and acting out because of their father's situation.

Mitchell's daughter Amena testified that she loved her father but knew he was in a lot of trouble. She promised she would stay in touch with him and send him letters.

(b) Mitchell's Criminal and Mental Health History

Mitchell was convicted in August 1988 for unlawfully taking a motor vehicle and placed on felony probation. In December 1989, he was convicted of possession of cocaine for sale. He was arrested in March 1990 for possession of cocaine and convicted in August 1990. Mitchell was arrested in August 1992, and ultimately convicted in November 1992 of possession of cocaine base for sale. His probation for the carjacking offense in 1988 was revoked, and he was sentenced to four years in prison. In December 1996, Mitchell was convicted of possession of marijuana for sale and granted probation. He was convicted of possession of PCP in July 2000, sentenced to two years in prison, and released in January 2002. Thereafter, he was arrested again for possession of cocaine base for sale, convicted in December 2002, and sentenced to prison for four years.

Karen Hofmeister of the University of California, San Diego psychiatry department interviewed Mitchell in June 2004 at the California Institute for Men, in advance of Mitchell being

paroled in order to gather information for the Parole Outpatient Clinic. She wrote in her report that Mitchell appeared depressed.

While still incarcerated, Mitchell came under the care of Dr. William Lawrence, who treated Mitchell for depression and prescribed a number of medications for Mitchell while he was in prison, including the antidepressant Wellbutrin. According to Dr. Lawrence's notes, there did not appear to be any change in Mitchell's mood or mental status from July 2004 to February 2005, and his medication did not change. The last time he saw Mitchell was in March 2005; his mental status exam was, according to Dr. Lawrence, "in essence, normal." He had a diagnosis of dysthymia, or persistent depressive disorder, and was on the same dose of Wellbutrin.

Dr. Nuingyu Kim, a psychiatrist for the Department of Corrections and Rehabilitation, met with Mitchell on June 24, 2005, and Mitchell told him that he had stopped taking Wellbutrin. Before the meeting, Dr. Kim read a brief summary of his social background. It stated that Mitchell had a long history of being institutionalized, abused as a child, and a long history of substance abuse, including PCP. Dr. Kim was concerned that Mitchell stopped taking his medication, but Dr. Kim could not force Mitchell to take it. As a result, they agreed that Mitchell would continue to see Dr. Kim once a month in case he needed medication, but then Mitchell did not show up for his next scheduled appointment.

Parole Agent Steven Day supervised Mitchell for a short period of time and said Mitchell appeared compliant with his parole. He testified that during those three months or so, Mitchell never tested positive for any kind of narcotics. The last

time he was tested was two to three days prior to his arrest for the three murders.

### (c) Mitchell's PCP Use

After Mitchell's encounter with the police on August 9, 2005, Dr. Jeff Grange treated Mitchell at the hospital for a gunshot wound and psychiatric symptoms. Mitchell arrived in an almost catatonic state and then later exhibited bizarre behavior. Based on this and the events with the paramedics and law enforcement, Mitchell was tested for drugs. A presumptive urine test was positive for PCP and marijuana. It was Dr. Grange's opinion that Mitchell likely had PCP in his system and that he exhibited behavior consistent with being on PCP. An independent laboratory confirmed that Mitchell had PCP in his system.

Felix D'Amico testified as a drug recognition expert. He said that symptoms of PCP appear almost immediately after smoking it and usually peak two to three hours later. He further noted that clinical symptoms continue for up to four to six hours and that behavioral manifestations continue for up to 11 hours. He noted that because PCP is stored in fatty cells and can be released by adrenaline, behavioral manifestations can reoccur even weeks later. Some of the behaviors he has observed in people under the influence of PCP include being agitated or excited, having hallucinations or delusions, and paranoia. Their vital signs (pulse, body temperature, blood pressure) are extremely high. Other symptoms include abnormal eye movements, blank stare, and inability to verbalize. He testified that these symptoms tend to cycle, such that one moment the individual will be calm and another moment something might set them off. He noted that when PCP is used with marijuana,

a user may experience greater impairment in terms of misperception of time, space, and distance, in addition to the possible symptoms from the PCP. Based on his review, D'Amico stated his opinion that Mitchell was under the influence of PCP on August 9, 2005.

Dr. Alan Abrams examined Mitchell and testified as an expert on psychopharmacology. He also reviewed Mitchell's childhood school records and concluded they were consistent with Mitchell growing up in a highly unstable, abusive, and neglectful home. Mitchell and his siblings were in and out of foster care and group homes because of their mother's abuse and neglect and their father's inability to care for them. As a child, Mitchell tested average to above average in intelligence, but his academic performance was poor.

Review of Mitchell's health records disclosed that Mitchell had a psychiatric diagnosis of dysthymia and was prescribed a variety of antidepressants including Remeron, Paxil, Prozac, and Wellbutrin. Dr. Abrams described dysthymic disorder as a type of depression that people experience when they have been unhappy their whole life, but not to the extremes of contemplating suicide or the inability to get out of bed. People so afflicted "have a lowgrade alienation feeling that something is missing, joylessness." He opined that it usually has to do with genetic predisposition and problems in child rearing.

Regarding PCP, Dr. Abrams said the drug is unlike almost any other abused drug because it makes people catatonic, insensible, and excitable. Dr. Abrams stated his opinion that the level of Mitchell's drug test administered at the time of his arrest — PCP in the amount of 11 nanograms per milliliter — indicated Mitchell most likely smoked a substantial amount of

21

PCP within the 24 to 72 hours before his arrest. Dr. Abrams explained that Mitchell's blood level of PCP and his irrational, violent, senseless, and out-of-control behavior suggested that after noon on August 8, 2005, Mitchell's behavior was strongly influenced by the effects of PCP. Dr. Abrams noted that one side effect of PCP is that it prevents the formation of memories. Dr. Abrams reported that Mitchell told him only that he "was driving around that day" and that he could not remember any involvement in the shootings. Dr. Abrams stated his view that Mitchell was intoxicated at the time of the shootings, but whether he acted with premeditation or malice "would be up for grabs."

## II.  GUILT PHASE ISSUES

### A. CALJIC Nos. 8.71 and 8.72 Instructional Error

#### *1. Background*

Mitchell contends that his convictions for first degree murder, with the special circumstance finding, should be reversed because the jury was instructed incorrectly. Mitchell was found death-eligible based on the multiple-murder special circumstance, which required that he be convicted of at least one first degree murder and one second degree murder in the same proceeding. (§ 190.2, subd. (a)(3).) Mitchell was charged with three murders during the two incidents — first the killing of Lopez and Mawikere at CAS, and thereafter the killing of Susano Torres at the Yellows. The prosecution proceeded solely on the theory that all three homicides were premeditated and deliberate first degree murder. That is the only theory of first degree murder on which the jury was instructed.

At the close of the guilt phase, the trial court gave the jury instructions on voluntary manslaughter, first degree murder,

and second degree murder, as the various possible theories of crimes that the evidence at trial supported. The trial court then gave the jury the 1996 revised versions of CALJIC Nos. 8.71 and 8.72. These instructions concern how the jury is to proceed if it finds reasonable doubt with respect to a greater offense.

The given version of CALJIC No. 8.71 reads: "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." The trial court appears to have slightly misstated the language of CALJIC No. 8.71 in its oral pronouncement by using the phrase "but you unanimously agree and you have a reasonable doubt" instead of "but you unanimously agree that you have a reasonable doubt." But there does not appear to be any substantive difference between the two formulations that would have affected the outcome. (See *People v. Osband* (1996) 13 Cal.4th 622, 717 ["as long as the court provides the jury with the written instructions to take into the deliberation room, they govern in any conflict with those delivered orally"].)

The given version of CALJIC No. 8.72 reads: "If you are convinced beyond a reasonable doubt and unanimously agree that the killing was unlawful, but you unanimously agree that you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of that doubt and find it to be manslaughter rather than murder."

Mitchell contends that the 1996 versions are flawed and that these instructions lowered the prosecution's burden of proof

and undermined the proof beyond a reasonable doubt standard, thereby violating his state and federal constitutional rights. Specifically, Mitchell observes that the versions of the instructions required that in order for the jury to return a verdict on the lesser charge, the jury must "unanimously agree that [they] have a reasonable doubt" as to whether the defendant was guilty of the greater charge or lesser charge. Mitchell contends this conveyed to jurors who harbored reasonable doubt that unless the doubt was shared by all of the other jurors, the duty to give the benefit of the doubt did not arise. As such, this conveyed to the jury that first degree murder was the default finding and thus lowered the prosecution's burden of proof by reassigning the benefit of the doubt to the prosecution.

### 2. *Analysis*

A claim of instructional error is reviewed de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4; *People v. Lucas* (2014) 60 Cal.4th 153, 287.) The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

Preliminarily, because Mitchell failed to object below, his state law claims asserting error on the instructions have been forfeited. (See *People v. Bolin* (1998) 18 Cal.4th 297, 327.) But failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected. (§ 1259; *People v. Lucas* (2014) 60 Cal.4th 153, 287.) Here, Mitchell claims that the flawed instructions deprived him of due process, and because this would affect his substantial rights if true, his claim is not forfeited.

In support of his claim, Mitchell cites *People v. Moore* (2011) 51 Cal.4th 386, where we stated that "the better practice is not to use the 1996 revised versions of CALJIC Nos. 8.71 and 8.72, as the instructions carry at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder, and between murder and manslaughter." (*Id.* at p. 411.) However, we expressly did not decide whether other jury instructions, such as CALJIC No. 17.40, dispel any confusion that might arise from CALJIC Nos. 8.71 and 8.72 because the jury in *Moore* had found true burglary-murder and robbery-murder special circumstances and thus had an alternative basis to find that the defendant was guilty of first degree murder. (*Moore*, at p. 412.)

In this case, unlike in *Moore*, the prosecution only relied on the premeditation theory to prove the charge of first degree murder against Mitchell. We hold that the instructions as a whole made clear the role of the juror's individual judgments in deciding between first and second degree murder, and between murder and manslaughter, thereby negating any potential confusion arising from CALJIC Nos. 8.71 and 8.72.

Mitchell's principal complaint is that the instructions' reference to unanimity confused jurors into thinking that even if they had reasonable doubt as to the greater charge in the instruction, they should defer to another juror's finding of no reasonable doubt. We rejected a similar argument in *People v. Salazar* (2016) 63 Cal.4th 214, 246–248 (*Salazar*). The only pertinent difference between *Salazar* and this case is that the trial court in *Salazar* instructed the jury with CALJIC No. 17.10 and omitted CALJIC No. 2.61. But *Salazar* remains relevant and instructive in its determination that "while we have disapproved the unanimity terminology in the 1996 revised versions of CALJIC Nos. 8.71 and 8.72 because of the potential for confusion, the instructions were not erroneous in this case *when considered with the rest of the charge to the jury*." (*Salazar*, at p. 248, italics added.) Mitchell contends that the instructions conveyed that "[i]f just one juror was convinced the homicides were the greater offense, then the other eleven jurors, who did have doubt that it was murder or first degree murder, would have no obligation to vote for the lesser offense." However, the jury was instructed with CALJIC No. 17.40, which made clear that "[t]he People and the defendant are entitled to *the individual opinion of each of you. . . . Each of you must decide the case for yourself*, but do so only after discussing the evidence and the instructions with your fellow jurors." (Italics added.) (See *People v. Buenrostro* (2018) 6 Cal.5th 367, 430 ["In the scenario defendant envisions, a jury's reasonable understanding of the instructions as a whole would result in a hung jury, not a directed verdict for first degree murder"].)

Mitchell's further arguments that CALJIC Nos. 8.71 and 8.72 improperly shifted the burden from the prosecution or set first degree murder as the default finding are similarly

unavailing. With regard to the prosecution's burden of persuasion, the jury was instructed with CALJIC No. 2.61, which made clear that the prosecution must prove beyond a reasonable doubt every element or charge against Mitchell. Also, in addition to CALJIC Nos. 8.71 and 8.72, the jury was instructed with CALJIC No. 8.74, which explains the determinations that the jury must unanimously make in order to render a guilty verdict for first degree murder: "Before you may return a verdict in this case you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree or voluntary manslaughter." This instruction makes clear that the jury must unanimously find that the defendant was "guilty of murder of the first degree or murder of the second degree or voluntary manslaughter," without preferring any of the options.

Mitchell argues that these other instructions fail to rectify the potential confusion because CALJIC Nos. 8.71 and 8.72 are the more specific instructions and thus, insofar as there was an inconsistency between CALJIC Nos. 8.71 and 8.72 and other instructions, the jury would have applied CALJIC Nos. 8.71 and 8.72. This is mistaken. Although it is true that CALJIC Nos. 8.71 and 8.72 are more specific in addressing the crimes with which Mitchell was charged, they are not more specific than CALJIC Nos. 17.40, 2.61, and 8.74 in addressing the subject matter at issue.

For each of the possible sources of confusion identified by Mitchell in CALJIC Nos. 8.71 and 8.72, the other jury instructions — CALJIC Nos. 17.40, 2.61, and 8.74 — addressed

those points more specifically: As to any potential confusion about whether each juror was to exercise his or her individual judgment or defer to another juror's judgment on whether there is reasonable doubt that Mitchell committed the greater crime, CALJIC No. 17.40 made clear that jurors are required to exercise their individual judgment in making this determination. CALJIC No. 2.61 more specifically addressed whether the prosecution bore the burden of proving the elements of the greater crimes; it expressly stated that the prosecution bears the burden to prove beyond a reasonable doubt every element or charge against Mitchell. And CALJIC No. 8.74 more specifically addressed whether the jury is to treat first degree murder as the default finding; it explained that the jury must be unanimous in deciding whether the defendant is guilty of first degree murder, second degree murder, or manslaughter, with no default among them. (See *People v. Gomez* (2018) 6 Cal.5th 243, 302 [any juror confusion arising from CALJIC No. 8.71 was remedied by CALJIC Nos. 17.40 and 8.74].)

We find no error in the jury instructions because when they are viewed as a whole, there is no reasonable likelihood that they caused the jury to misapply the law in violation of the Constitution.

## B. CALJIC No. 8.73.1 Instructional Error

### 1. *Background*

Mitchell next contends that the trial court erred in refusing to instruct the jury pursuant to CALJIC No. 8.73.1. On August 3, 2006, at the guilt phase jury instruction conference, defense counsel requested that the trial court give CALJIC No.

8.73.1. That instruction states: "A hallucination is a perception that has no objective reality. [¶] If the evidence establishes that the perpetrator of an unlawful killing suffered from a hallucination which contributed as a cause of the homicide, you should consider that evidence solely on the issue of whether the perpetrator killed with or without deliberation and premeditation." (CALJIC No. 8.73.1.)

Without immediately deciding the question, the trial court first noted that there was no medical evidence that Mitchell was hallucinating, but that there was evidence that Mitchell was "yelling about shooting the devil" and that Armando Torres had tattoos of horns on his head. The prosecutor argued that because Armando actually had horn tattoos, Mitchell's statements about shooting the devil were not hallucinations. Defense counsel countered that despite the tattoos, Mitchell's statements about shooting the devil did not necessarily refer to Torres. The prosecutor agreed that Mitchell may not have been referring to Armando. The trial court then deferred deciding the issue to hear counsel's arguments on the applicability of *People v. Padilla* (2002) 103 Cal.App.4th 675, a case cited in reference to CALJIC No. 8.73.1.

On August 7, 2006, when the trial court revisited the issue, defense counsel informed the trial court that Mitchell had instructed him "not to present a psychiatric defense or a drug defense" at the guilt phase and that he had decided for tactical reasons not to oppose his client's decision. However, defense counsel stated that he was still requesting that CALJIC No. 8.73.1 be given. The prosecutor maintained that the evidence only arguably showed that Mitchell might have been under the influence of some drug on August 9, 2005, the day after the

29

charged homicides. Thus, the prosecutor argued that the instruction was irrelevant. The trial court agreed and refused to give the instruction.

Mitchell argues that there was evidence that he was suffering from hallucinations during the shootings of August 8, 2005, evidenced by the fact that he called Armando "devil" and that he was behaving erratically the next day, including making statements that he had killed the devil. Accordingly, he claims that the jury should have been instructed and consequently could have determined that there was no deliberation or premeditation in the homicides. Mitchell claims that the trial court's denial of his requested instruction violated state law and his due process right to a fair trial and a meaningful opportunity to present a defense.

### 2. *Analysis*

In general, a trial court must give a requested jury instruction if there is substantial evidence in the record supporting such an instruction. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1008 [so holding with respect to instructions on lesser included offenses].) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.) "On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence — evidence that, if believed by a rational jury, would have raised a reasonable doubt as to" an element of the crime in question. (*People v. Mentch* (2008) 45 Cal.4th 274, 288.

Here, there was not sufficient evidence to warrant the trial court giving the requested instruction at the time of the request. Mitchell points to only two facts that could support the requested instruction: (1) that he called Armando Torres "devil" before shooting him; and (2) that he was behaving erratically, possibly under the influence of PCP, on the day after his shooting sprees, including making statements that he had killed the devil. Notably, at the guilt phase, counsel chose not to present a psychiatric or drug defense and did not dispute the trial court's statement that there was no medical evidence of hallucination.

The fact that Mitchell called Armando "devil" does not alone provide sufficient evidence that Mitchell was hallucinating. In using the term "devil," Mitchell may have been referring to Armando because of his horn tattoos. Moreover, although Armando initially testified on direct examination that Mitchell had never called him the devil before, later on redirect Armando stated that Mitchell "always" called him the devil despite Armando telling him not to.

Mitchell's erratic behavior on the day after the shootings also does not show he was suffering from hallucinations. Even assuming Mitchell was under the influence of PCP on August 9, 2005, both parties agree that there is no medical evidence in the record to indicate that he was under the influence on the day of the shootings. Mitchell also presented no evidence that he had suffered hallucinations during any prior use of PCP. Mitchell notes he was "crazily" shooting his gun into the air, screaming about killing the devil and being the devil, and saying that God would not judge him for killing the devil. But Mitchell's indiscriminate shooting into the air does not imply he was

31

hallucinating, and his usage of the word "devil" does not imply that he was in fact perceiving a "devil" as opposed to simply referring to the concept or referring to Armando by a nickname.

The cases Mitchell relies upon to support this claim offered significantly more compelling evidence that a defendant suffered from hallucinations, including medical evidence. (See *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1444 [medical evidence showed defendant was diagnosed with major depression with "psychotic features, including delusions," and defendant testified that he suffered specific hallucinations in which he witnessed the victim transforming into the devil]; *People v. Duckett* (1984) 162 Cal.App.3d 1115, 1118 [medical expert testified that defendant suffered from chronic paranoid schizophrenia and that defendant experienced " 'command hallucinations' " in an "acute phase" of his illness at the time of the killing]; *People v. Pennington* (1967) 66 Cal.2d 508, 512 [medical expert testified, in the context of assessing defendant's competence for trial, that defendant was suffering from hallucinations indicative of schizophrenia and stated that "he had observed defendant go into a fit of 'psychotic furor' "].)

It is of course possible that Mitchell was hallucinating, but a mere possibility is not enough. There must be substantial evidence to warrant the instruction. In light of the absence of evidentiary support for Mitchell's argument, coupled with the support for the alternative explanation, we believe no reasonable jury would have credited Mitchell's explanation. The trial court's refusal to instruct the jury with CALJIC No. 8.73.1 did not deny Mitchell his due process rights to a fair trial or a meaningful opportunity to present a defense.

## C. Cumulative Error at the Guilt Phase

Because we reject Mitchell's claims of error at the guilt phase, there is no cumulative error requiring reversal of his convictions.

## III. PENALTY PHASE ISSUES

## A. CALJIC No. 2.20 Instructional Error

### 1. Background

Mitchell contends the trial court erred at the penalty phase by failing to instruct the jury properly on witness credibility. At the jury instructions hearing for the penalty phase, the trial court discussed CALJIC No. 2.20, the jury instruction addressing what jurors may consider in assessing witness credibility. That pattern instruction says: "Every person who testifies under oath [or affirmation] is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness. [¶] In determining the believability of a witness you may consider anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following: [¶] The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness testified; [¶] The ability of the witness to remember or to communicate any matter about which the witness has testified; [¶] The character and quality of that testimony; [¶] The demeanor and manner of the witness while testifying; [¶] The existence or nonexistence of a bias, interest, or other motive; [¶] The existence or nonexistence of any fact testified to by the witness; [¶] The attitude of the witness toward this action or toward the giving of testimony[.][;] [¶] [A statement [previously] made by

33

the witness that is [consistent] [or] [inconsistent] with [his] [her] testimony][.][;] [¶] [The character of the witness for honesty or truthfulness or their opposites][;] [¶] [An admission by the witness of untruthfulness][;] [¶] [The witness' prior conviction of a felony][;] [¶] [Past criminal conduct of a witness amounting to a misdemeanor][;] [¶] [Whether the witness is testifying under a grant of immunity]."  (CALJIC No. 2.20.)

The last six paragraphs of CALJIC No. 2.20 may be omitted based on the evidence presented at trial.  In discussion with counsel, the trial court reviewed whether evidence supported the inclusion of any of the six bracketed paragraphs in the instruction.  The trial court stated that "no witness had a felony conviction," defense counsel agreed, and the prosecutor remained silent.  As a result, the trial court fashioned an instruction, ultimately delivered to the jury, which eliminated the last six paragraphs of the pattern CALJIC No. 2.20 instruction, as well as the reference to "affirmation" in the instruction's introductory paragraph.

It appears that the trial court and the parties failed to recall that witness Armando Torres, who testified for the prosecution at the guilt phase and would testify at the penalty phase, had admitted that he had been convicted of felony robbery.  As a result, the penalty phase jury was not instructed that a witness's prior conviction of a felony bore on his credibility, as set forth in CALJIC No. 2.20 and CALJIC No. 2.23.  Although the jury did receive the version of CALJIC No. 2.20 containing the language pertaining to felony convictions as well as CALJIC No. 2.23 at the guilt stage, the jury was specifically instructed at the penalty phase to disregard the guilt phase instructions.

34

Consequently, Mitchell contends the incomplete instructions denied his state and federal constitutional rights to a fair penalty trial, due process, and a fair penalty determination mandating the reversal of his death judgment. We reject this claim, as the error in failing to reinstruct on principles relating to evaluating the credibility of a witness in the penalty phase was harmless beyond a reasonable doubt.

### 2. *Analysis*

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case,' including instructions relevant to evaluating the credibility of witnesses." (*People v. Blacksher* (2011) 52 Cal.4th 769, 845–846; see also §§ 1093, subd. (t), 1127.) This duty includes giving correct instructions regarding the credibility of witnesses. As we have stated, "[T]he court should give the substance of CALJIC No. 2.20 in every criminal case, although it may omit factors that are inapplicable under the evidence." (*People v. Horning* (2004) 34 Cal.4th 871, 910.)

As discussed, Mitchell's counsel assented to the trial court's formulation of CALJIC No. 2.20, omitting the bracketed language regarding a witness's prior felony convictions. Therefore, any claim of state law error has been forfeited and has not been preserved for appeal. (*People v. Bolin, supra,* 18 Cal.4th at p. 328.) That said, under section 1259, a reviewing court has the authority to review any question of law involving an instruction if the defendant's substantial rights were affected, notwithstanding a failure to preserve the issue for appeal. Thus, we will consider Mitchell's claim that the

omission of the portion of CALJIC No. 2.20 was constitutional error.

Here, any error in the failure to instruct the jury on the impact of a felony conviction on a witness's credibility was undoubtedly harmless beyond a reasonable doubt. The jury was aware that Armando was a felon, as he testified at the guilt phase that he had a prior felony conviction for robbery. The jury was instructed that it could consider evidence from any phase of the trial, and although the jury was not specifically instructed about the impact of felony convictions on a witness's credibility, the jury was instructed that it could "consider anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness." Thus, the jury was well appraised of Armando's felony conviction and equipped to assess Armando's credibility in light of his criminal past.

Moreover, the subject of Armando's testimony at the penalty phase was not controversial. Armando testified that he liked his younger brother and missed him. He testified that when he thinks about his brother, he uses drugs to make his thoughts go away, that his methamphetamine use has gotten worse, and that as a result he has ended up in custody. The jury was also made aware that Armando was currently in custody relating to charges involving great bodily injury, drugs, and a firearm. The fact that Armando was a convicted felon at the time of his testimony bore little relevance to the subject of his testimony about how Susano's murder had affected his life. Furthermore, given what the jury knew about Armando's drug use and criminal behavior, the fact that his prior felony conviction was not specifically called to the jury's attention had marginal relevance in negatively impacting Armando's

credibility.  Consequently, it is not reasonably possible that the jury would not have returned a death verdict had it been expressly told it could consider Armando's felony conviction in assessing his credibility.

### B. **Constitutionality of California's Death Penalty Statute**

Mitchell raises several constitutional challenges to California's death penalty scheme.  We have rejected these claims before, as follows, and we decline to revisit our prior holdings:

"The death penalty law adequately narrows the class of death-eligible defendants." (*People v. Boyce* (2014) 59 Cal.4th 672, 723; *Salazar*, *supra*, 63 Cal.4th at p. 255.)

Consideration of the circumstances of the crime during the penalty phase pursuant to section 190.3, factor (a), does not result in an arbitrary and capricious application of the death penalty and does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.  (*People v. Winbush* (2017) 2 Cal.5th 402, 489 (*Winbush*); see also *Tuilaepa v. California* (1994) 512 U.S. 967, 976 [§ 190.3, factor (a) does not violate the Eighth Amendment and is not unconstitutionally vague].)

The jury need not make findings beyond a reasonable doubt that aggravating factors were present (other than Penal Code section 190.3, factor (b) or (c) evidence), that they outweighed the mitigating factors, or the factors were substantial enough to warrant a judgment of death under *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 530 U.S. 584, and *Cunningham v. California* (2007) 549 U.S. 270.  (See

*People v. Merriman* (2014) 60 Cal.4th 1, 106; *People v. Griffin* (2004) 33 Cal.4th 1015; *People v. Blair* (2005) 36 Cal.4th 686, 753.)

The federal Constitution does not require the court to instruct the jury that the prosecution has the burden of persuasion regarding the existence of aggravating factors, nor is the court required to instruct the jury that there is no applicable burden of proof. (*People v. Mendoza* (2016) 62 Cal.4th 856, 916; *People v. Lenart* (2004) 32 Cal.4th 1107, 1136–1137; *People v. Holt* (1997) 15 Cal.4th 619, 682–684.)

The jury is not required to unanimously find that certain aggravating factors warrant the death penalty under the federal Constitution, and the equal protection clause does not compel a different result. (*People v. Enraca* (2012) 53 Cal.4th 735, 769; *People v. Casares* (2016) 62 Cal.4th 808, 854.) The court is also not required to instruct the jury that it need not unanimously find particular facts in mitigation. (*People v. Cage* (2015) 62 Cal.4th 256, 293 (*Cage*).)

CALJIC No. 8.88 does not improperly instruct the jury that a verdict of death is required if the factors in aggravation outweigh the factors in mitigation. (*People v. Arias* (1996) 13 Cal.4th 92, 170–171.)

The use of adjectives like "extreme" and "substantial" in the list of mitigating factors in section 190.3 does not act as a barrier to the jury's consideration of mitigating evidence in violation of the federal Constitution. (*People v. McKinnon* (2011) 52 Cal.4th 610, 692; *People v. Avila* (2006) 38 Cal.4th 491, 614–615.)

The court's use of CALJIC No. 8.88, which instructs that jurors must be "persuaded that the aggravating circumstances

are so substantial in comparison with the mitigating circumstances" to warrant a death judgment, is not unconstitutionally vague, appropriately informs jurors, and does not violate the Eighth and Fourteenth Amendments to the federal Constitution. (*People v. Landry* (2016) 2 Cal.5th 52, 122–123 (*Landry*); *People v. Williams* (2016) 1 Cal.5th 1166, 1204–1205.)

The trial court has no obligation to delete from CALJIC No. 8.85 inapplicable mitigating factors, nor must it identify which factors are aggravating and which are mitigating. (*People v. Cook* (2006) 39 Cal.4th 566, 618; *People v. Hillhouse* (2002) 27 Cal.4th 469, 509 ["The aggravating or mitigating nature of the factors is self-evident within the context of each case."].) "We again conclude that the instruction is 'not unconstitutional for failing to inform the jury that: (a) death must be the appropriate penalty, not just a warranted penalty [citation]; (b) [a sentence of life without the possibility of parole] is required, if it finds that the mitigating circumstances outweigh those in aggravation [citation] or that the aggravating circumstances do not outweigh those in mitigation [citation]; (c) [a sentence of life without the possibility of parole] may be imposed even if the aggravating circumstances outweigh those in mitigation [citation]; (d) neither party bears the burden of persuasion on the penalty determination.' " (*Landry, supra,* 2 Cal.5th at p. 122.)

"The impact of a defendant's execution on his or her family may not be considered by the jury in mitigation." (*People v. Bennett* (2009) 45 Cal.4th 577, 601; *People v. Smithey* (1999) 20 Cal.4th 936, 1000 [" 'Sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation' "].)

The trial court need not instruct the jury that life without parole was presumed the appropriate sentence; "[t]here is no requirement jurors be instructed there is a ' " 'presumption of life' " ' or that they should presume life imprisonment without the possibility of parole is the appropriate sentence." (*People v. Parker* (2017) 2 Cal.5th 1184, 1233.) And "[j]urors need not make written findings in determining penalty." (*People v. Valdez* (2012) 55 Cal.4th 82, 180.)

The federal Constitution does not require intercase proportionality review among capital cases. (*Winbush*, *supra*, 2 Cal.5th at p. 490; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51.) "California's death penalty law does not violate equal protection by treating capital and noncapital defendants differently." (*People v. Sánchez* (2016) 63 Cal.4th 411, 488.) California's use of the death penalty does not violate international law, the federal Constitution, or the Eighth Amendment's prohibition against cruel and unusual punishment in light of "evolving standards of decency." (*Cage*, *supra*, 62 Cal.4th at p. 297; see *People v. Zamudio* (2008) 43 Cal.4th 327, 373.)

## IV.  CUMULATIVE ERROR

Because we have only found one error in the proceeding — at the penalty phase regarding the trial court's failure to instruct the jury that a witness's prior conviction of a felony bore on his credibility — and because we have determined that the error was harmless beyond a reasonable doubt, we find there is no cumulative error requiring reversal of Mitchell's convictions or penalty of death.

## CONCLUSION

For the reasons above, we affirm the judgment.


**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C.J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mitchell

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S147335
**Date Filed:** June 24, 2019

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Brian S. McCarville

_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointment by the Supreme Court, Harry Gruber and Maria Morga, Deputy State Public Defenders, for Defendant and Appellant.


Kamala D. Harris and Xavier Becerra, Attorneys General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Maria Morga
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

Kristen Kinnaird Chenelia
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 525-4232