Filed 11/8/24  P. v. Embrey CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JORDAN LEE EMBREY,<br><br>    Defendant and Appellant. | F083822<br><br>(Super. Ct. No. F16902216)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Jake Stebner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Jordan Lee Embrey was convicted of second degree murder and false imprisonment. Defendant drove with Juan Carlos Luna to the victim's motel room to confront the victim for abusing Luna's cousin. Defendant restrained the cousin while Luna accosted the victim with a knife. Luna stabbed the victim three times, penetrating the victim's pulmonary artery and causing his death. Defendant and Luna were tried together for murder and the jury found both guilty.

Defendant contends: (1) the trial court's instructions improperly called for the jury to convict defendant of murder without finding he personally acted with implied malice aforethought; (2) the court erroneously instructed the jury the lesser offense of voluntary manslaughter applied only to murder in the first degree; (3) the prosecutor misstated the law in closing argument by telling the jury imperfect defense of another could potentially lessen the murder charge from first degree to second degree; (4) the court committed misconduct by adding improper commentary bolstering the prosecution when overruling defense counsel's objection to the prosecutor's closing argument; (5) any failure of defense counsel to preserve review of the instructional errors, prosecutorial misconduct, or judicial misconduct deprived defendant of his right to effective assistance of counsel; and (6) reversal is required under the cumulative error doctrine.

We affirm.

## PROCEDURAL SUMMARY

On May 4, 2018, the Fresno County District Attorney filed an information charging defendant and codefendant Juan Carlos Luna with the murder of Hector Torres, Sr. (Pen. Code, § 187, subd. (a); count 1)[1] and defendant with false imprisonment (§ 236; count 2). The information also alleged Luna personally used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)).

---

[1] All further statutory references are to the Penal Code.

2.

On November 12, 2021, the jury found defendant and Luna guilty of second degree murder and defendant guilty of false imprisonment. The jury also found true the allegation Luna personally used a deadly and dangerous weapon.

On January 20, 2022, the trial court sentenced defendant to 15 years to life for murder (count 1) with a concurrent middle term of two years for false imprisonment (count 2).

Defendant filed a timely notice of appeal.

**FACTUAL SUMMARY**

Hector Torres, Sr., was in a relationship with Luna's cousin, Elise, for 11 years before his death.[2] Torres and Elise's relationship was volatile, with frequent arguing. Torres had also been physically violent toward Elise for years. Elise's family, including Luna, was aware of Torres's abuse. Luna had told Elise that Torres "was going to get his a** whooped when he got out of jail because of how he was treating [Elise]."

In March 2016, Torres and Elise were living in room 223 at a motel in Fresno with their three children. Elise was about five or six months pregnant with their fourth child. On March 24, 2016, Torres went to his mechanic job. During his lunch break, Torres returned to the motel, but stayed outside the room in a car. Torres called Elise on her cell phone and asked what she was doing. Elise was outside talking to the girl from the neighboring room, but she told Torres she was inside their room. Torres told Elise to look to her left and asked, "'Do you see the red car?'" Torres then said, "'Well, I see you.' … I caught you.'" Torres was mad Elise was outside the room because he did not want her talking to the people from the neighboring room. Torres said to Elise, "'Watch, b**ch, watch when I get home b**ch,'" and then hung up on her. Elise took that to mean she was going to be smacked or yelled at when Torres returned home.

---

[2] Elise's preliminary hearing testimony was read into the record at trial because Elise was unavailable to testify.

3.

Torres and Elise exchanged angry text messages during the day after Torres left. Their oldest daughter was picked up by Elise's mother around 6:00 or 7:00 p.m.

Torres and Elise continued to argue after Torres returned to the motel later that day. Torres accused Elise of lying to him and sleeping with the man in the neighboring room. Elise explained she was just talking to the girl in the next room because she gets lonely at the motel with the kids all day. Torres slapped Elise twice in the face. He had his hand up to slap her again and said, "'Shut the f**k up, b**ch. I'm going to knock your teeth out.'" Elise stayed quiet. Torres then spit on Elise.

Before the slapping, Elise called her grandfather and asked him to pick her up, but he was out of town. After the slapping, Elise sent text messages to Luna via the cell phone of his then-girlfriend, Jacqueline. Luna and Jacqueline were living together at the time. Elise told Luna in these messages that Torres slapped her. She messaged Luna that she was "tired of [Torres] putting his hands on [her]" and she wanted "him to get beat up."

Defendant drove with Luna and Jacqueline from Jacqueline's house to the motel that night. The motel's video surveillance showed defendant, Luna and Jacqueline arrived at the motel at 9:37 p.m.[3] Jacqueline sent a message to another of Luna's cousins, Marilyn, saying that Torres was slapping Elise. Jacqueline asked Marilyn for Elise and Torres's room number. Marilyn responded to Jacqueline and mistakenly said they were in room number 232 (not 223) at the motel. The trio walked along the motel walkways, but were unable to find a room 232 because the room numbers only go up to 230. The motel's video surveillance showed defendant, Luna, and Jacqueline walking around the motel looking for the room. Luna had a large object that appeared to be a knife protruding from his pants pocket. The group returned to and got back in the car, but

---

[3]      The timestamp for the video surveillance system was 30 minutes behind real time.

defendant and Luna then got back out. Luna messaged Elise to ask where she was, and she responded, "'Don't worry about it.' … '[Torres] left already.'"

Defendant and Luna located Torres's room with the help of another motel guest. Video surveillance showed Luna outside Elise's room door with a large knife in his right hand and defendant standing close behind Luna.

Elise was lying on the bed crying when there was a knock on the motel room door. Elise's son, H.T., was playing with toys underneath the bed and her one-year-old daughter was sitting on one of the beds. Torres was in the bathroom. H.T. told Elise, "'I got it, mom,'" and went to open the door. Elise told H.T., "'No, no, don't open the door,'" but H.T. opened the door. Elise saw Luna at the door and screamed to Torres that her cousin was there. She ran to shut the door, but Luna put his foot in the way so Elise could not close the door. Elise tried to push Luna out the door. H.T. hid under the bed. Luna asked Elise, "'Where's [Torres]?'" She said, "'He's not here. He left.'" Luna said, "'You're lying'" and shoved Elise out of the way into the room. Elise fell to the floor. Defendant followed directly behind Luna into the room. Elise got up and screamed to Torres that her cousin was in the room. Luna shoved Elise out of the way and went towards the bathroom. Defendant closed the door to the room.

Defendant came from behind Elise and put his hand over her mouth while she was screaming hysterically. Elise tried to turn her head to see defendant, but he turned her back. Defendant used his other hand to hold Elise's body. Elise struggled with defendant to break free so she could get to Torres.

Luna opened the bathroom door with the knife in his hand. Torres was standing in the bathroom with his hands in the air. Luna asked Torres, "'Are you hitting my cousin, Dog? Are you hitting my cousin?'" Torres said, "'No, I'm sorry. I'm sorry.'" Luna went at Torres with the knife. Elise saw Luna stab Torres three times. Torres put his hands up to defend himself. At some point, Elise tried to run out of the room, but defendant pulled her back in by grabbing her by the hand, arms, and her "hoodie."

Elise pushed defendant's hand up against her mouth, bit defendant's hand and broke free. Elise tried to take the knife from Luna and cut her hand. Torres fell to the floor. H.T. saw his father fall to the ground from underneath the bed. Defendant, Luna, and Elise struggled over the knife. Defendant and Luna managed to pull the knife away and ran from the room. Defendant, Luna, and Jacqueline then drove back to Jacqueline's house.

Elise called 911 and tried to stop Torres's bleeding. Police and emergency medical personnel arrived and tried to save Torres. Torres was unresponsive and taken by ambulance to the hospital. Torres died from his wounds.

Dr. Michael Chambliss, the Fresno County forensic pathologist, conducted an autopsy on Torres's body. Torres had sustained multiple wounds, including a penetrating stab wound just below the left collarbone on the front upper chest. The knife did not penetrate Torres's heart, but sliced through Torre's rib, went to the top of his heart, and ultimately penetrated the main pulmonary artery causing internal bleeding. Dr. Chambliss considered this wound to be the cause of Torres's death and estimated a person stabbed in this manner would take five to ten minutes to die.[4]

Fresno Police arrested Luna on April 7, 2016, and defendant on September 19, 2017. Fresno Police Sergeant Antonio Rivera interviewed Luna and defendant. Luna told Rivera he wanted to beat up Torres and went to the motel with the secondary purpose of getting Elise and the kids.

## DISCUSSION

### I. Asserted Instructional Errors

#### A. Standard of Review

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).) "In considering a claim of instructional error we must first

---

[4] Torres had methamphetamines in his system at the time of his death.

ascertain what the relevant law provides ….." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) "The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*Mitchell, supra*, at p. 579.)

### B. Jury Instructions on Aiding and Abetting a Murder

Defendant argues reversal on the murder conviction is required because the jury instructions improperly permitted the jury to convict him without finding he personally acted with malice.[5]

### 1. Additional Background

The trial court instructed the jury on liability for a crime as either the perpetrator or by aiding and abetting the perpetrator with CALCRIM No. 400: "A person may be guilty of a crime in two ways, one, he may have directly committed the crime. I call that person the perpetrator; two, he may have aided and abetted a perpetrator who directly committed the crime. A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator."

The jury was also instructed using CALCRIM No. 401 in relevant part: "To prove that Defendant Embrey is guilty of the crime of Murder based on aiding and abetting that crime, the People must prove the following: [¶] Number one, Juan Luna committed the crime; [¶] number two, defendant Embrey knew that Juan Luna intended to commit the crime; [¶] number three, before or during the commission of the crime, Defendant Embrey intended to aid and abet the perpetrator in committing the crime; [¶] and

---

[5]     As defendant argues, this instructional error claim is cognizable on appeal because defendant claims the instruction omitted an element of the offense and, if correct, the instruction affected his substantial rights, requiring no objection to preserve the issue. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503; § 1259.) The People do not argue defendant forfeited this claim and concede the trial court has a sua sponte duty to instruct the jury on the elements of the offense. (See *People v. Merritt* (2017) 2 Cal.5th 819, 824.) Because we address the claim on the merits, we need not address defendant's alternative claim of ineffective assistance of counsel, which is premised on forfeiture.

number four, Defendant Embrey's words or conduct did, in fact, aid and abet—it should be Juan Luna's commission of the crime. [¶] Someone aids and abets a crime if he knows the perpetrator's unlawful purpose, and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime."

The elements of murder were given using CALCRIM No. 520: "The defendants are charged in Count One with murder in violation of Penal Code section 187. To prove that the defendant is guilty of this crime, the People must prove the following: [¶] Number one, the defendants committed an act that caused the death of another person; [¶] number two, when the defendants acted, he had the state of mind called malice aforethought; [¶] and number three, he killed without lawful excuse or justification." With respect to malice, the jury was instructed in relevant part: "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish a state of mind required for murder. The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if: [¶] Number one, [he] intentionally committed an act; [¶] and number two, the natural and probable consequences of the act were dangerous to human life; [¶] number three, at the time he acted, he knew his act was dangerous to human life; [¶] and number four, he deliberately acted with conscious disregard to human life. [¶] … [¶] An act causes death if the death is the direct, natural and probable consequence of the act, and the death would not have happened without the act. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

The jury was further instructed using CALCRIM No. 252: "The crimes and the allegation charged in the case require proof of the union or joint operation, of act and wrongful intent. [¶] The crime charged in Count One requires a specific intent or mental

state.  To find a person guilty of that crime.  The person must not only intentionally commit the prohibited act but must do so with specific intent.  The act and the specific intent required is explained in the instruction for Count One."

During closing argument, the prosecutor argued both Luna and defendant were guilty of either first degree or second degree murder.  The prosecutor asserted the evidence established that Luna was the perpetrator and defendant was an aider and abettor.  The prosecutor explained defendant's alleged role:  "[Defendant is] in the room when the stabbing occurred.  That's testimony from Elise, that she gets wrapped up by [defendant] holding on to her, covering her mouth, and she's watching the stabbing occur, and in order to do that to somebody, you have to be right behind them.  You have to be looking at the exact same thing because why else would Elise be screaming unless this was going on and [defendant] knew that—[defendant] knew that … Luna was doing that dangerous act.  He was putting that knife into … Torres, and he knew that that could cause and lead to someone's death.  Like I said, he's facing the same—he would have to be facing the same direction as … Luna watching this all transpire in this very small motel room, not to mention the mirror that's in the back of it.…  He watches … Luna commit a dangerous act that led to the death of Hector Torres.  He watched this himself personally, and there's a reason he had to go and grab Elise as she tries to run out, because he knows exactly what's going on at that point in time."  The prosecutor primarily argued for defendant's guilt on implied malice murder:  "although there is evidence of first degree murder as to [defendant], it's a much stronger case that it was second, in the sense of, at the point[] when they're at the door and that knife is out, he sees that knife, and he works in conjunction with … Luna, they get inside and … Luna makes that beeline for the bathroom, he knows.  He knows at that point in time what that dangerous act that is going to occur.  And when that stabbing is going down, he is in the process of aiding and abetting.  He knows it's a dangerous act.  [Defendant] knows that

9.

when you stab somebody with a knife, there's a probable and likely consequence that someone's going to get hurt or someone's going to die."

Defendant's attorney argued defendant was "just" Luna's ride and did not have malice aforethought because defendant did not intend to kill Torres or assist Luna in stabbing Torres. Defense counsel asked the jury to find defendant guilty of false imprisonment but not guilty of murder.

### 2. Aiding and Abetting an Implied Malice Murder

Murder is the unlawful killing of a human being with malice aforethought. (*People v. Schuller* (2023) 15 Cal.5th 237, 243 (*Schuller*); § 187, subd. (a).) Malice may be express or implied. Malice is express when there is a deliberate intent to kill. (§ 188, subd. (a)(1).) "Murder is committed with implied malice when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*); see § 188, subd. (a)(2) [malice is implied "when the circumstances attending the killing show an abandoned and malignant heart"].)

A "person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*); see § 31.) "Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime." (*People v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*), superseded on another ground by statute as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.) "Except for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state, sometimes called the mens rea." (*McCoy, supra*, at p. 1117.) An aider and abettor's "guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*Ibid.*) In other words, "[a]n aider and abettor must do something *and* have a certain mental state." (*Ibid.*) "[A] person aids and abets

10.

the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

The law recognizes two forms of liability for aiders and abettors: (1) directly aiding and abetting the perpetrator's commission of the target offense, and (2) the natural and probable consequences doctrine, under which "an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)." (*Gentile, supra*, 10 Cal.5th at p. 843.) Until the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) in 2018, the natural and probable consequences doctrine allowed an aider and abettor to be liable for second degree murder without personally possessing malice aforethought. (*Gentile, supra*, at p. 846.) Effective January 1, 2019, Senate Bill 1437 added subdivision (a)(3) to section 188. (Stats. 2018, ch. 1015, § 2.) Section 188, subdivision (a)(3) provides that, except for felony murder, to be convicted of murder, "a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Senate Bill 1437 "makes personally possessing malice aforethought a necessary element of murder" and thus bars a murder conviction under the natural and probable consequences doctrine. (*Gentile, supra*, at p. 846.) "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder [though] because a direct aider and abettor to murder must possess malice aforethought." (*Id.* at p. 848.) "For implied malice, the intent requirement is satisfied by proof that the actual perpetrator "'knows that his conduct endangers the life of another and … acts with conscious disregard for life.'" [Citation.] Therefore, notwithstanding Senate Bill 1437's elimination of natural and

11.

probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Id.* at p. 850.)

### 3. *Powell* and *Langi*

Defendant argues the jury was erroneously instructed it could find defendant guilty of second degree murder as an accomplice based only on a finding he aided and abetted the crime of murder without finding defendant personally possessed malice while doing so. Defendant relies primarily on *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*) and *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*) in support of this argument.

In *Powell*, the defendants were convicted of second degree murder and first degree residential burglary. A group of four men, including Powell and Langlois, broke into the victim's house and beat the victim in retaliation for the beating of the defendants' friend by the victim's son. (*Powell, supra*, 63 Cal.App.5th at pp. 691–692.) The victim sustained stab wounds during the attack, one of which was fatal. (*Id.* at p. 699.) In rejecting Langlois's argument he could not be convicted of implied malice murder as an aider and abettor, the court explained: "In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Id.* at p. 713, fns. omitted.) The court determined the jury was not instructed on an invalid legal theory because "an aider and abettor can be liable for implied malice murder as a theory

12.

independent of the natural and probable consequences doctrine." (*Ibid*.) The court nonetheless concluded the instructions were erroneous because the aiding and abetting instruction given pursuant to CALCRIM No. 401 was not tailored to an implied malice murder charge. (*Powell, supra*, at p. 714.) Specifically, the instruction refers to aiding and abetting the perpetrator with the *crime*.[6] But "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather, relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Powell, supra*, at p. 714.) The court nonetheless concluded the erroneous instruction was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Powell, supra*, at pp. 714–718.)

While *Powell* involved a direct appeal, *Langi* considered the aiding and abetting instruction where the defendant requested resentencing pursuant to section 1172.6 (former § 1170.95).[7] The defendant, with three others, beat and robbed a group, including the victim who died after someone in the defendant's group punched the victim, causing him to fall to the ground and hit his head. (*Langi, supra*, 73 Cal.App.5th at

---

[6] The jury in *Powell* was instructed on the elements of aiding and abetting using CALCRIM No. 401 as follows: "'To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove the following: [[¶] 1. The perpetrator committed the crime. [¶] 2. The defendant knew that the perpetrator intended to commit *the crime*. [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing *the crime*; and [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of *the crime*.'" (*Powell, supra*, 63 Cal.App.5th at p. 706.)

[7] Former section 1170.95, enacted as part of Senate Bill 1437 and "amended effective January 1, 2022, by Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill No. 77), authorizes resentencing of persons convicted of murder 'under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime.'" (*Langi, supra*, 73 Cal.App.5th at p. 975.) Effective June 30, 2022, section 1170.95 was amended and renumbered to section 1172.6. (Stats. 2022, ch. 58, § 10.) We refer to the current statutory number for clarity.

p. 975.) The defendant was convicted of second degree murder, robbery, and battery. (*Id.* at p. 977.) The defendant argued the standard instructions permitted the jury to impute malice to him based solely on his participation in the crime. (*Id.* at p. 980.)[8] The court, relying on *Powell*, concluded that where the trial court uses a standard aiding and abetting instruction for second degree murder "without tailoring it to the specifics of that crime, the instruction creates an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Langi, supra*, at p. 982, fn. omitted.) The "second-degree-murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death. Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Id.* at pp. 982–983.) The court thus found the instructions given to the jury deficient because the "instructions should have explained that, to be guilty as a direct aider and abettor of second degree murder, an accomplice must have acted with the mental state of implied malice. [Citation.] More precisely, as *Powell* holds, the accomplice must have aided the perpetrator's commission of the life-endangering act while 'personally harbor[ing]' the mental state of implied malice." (*Id.*

---

[8]  The jury in *Langi* was instructed using CALJIC No. 3.01: "'A person aids and abets the commission … of a crime when he or she:  [¶]  (1) With knowledge of the unlawful purpose of the perpetrator, and  [¶]  (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, …  [¶]  (3) By act or advice aids, promotes, encourages or instigates the commission of the crime.'" (*Langi, supra*, 73 Cal.App.5th at p. 981, fn. omitted.)

at p. 983.)  The instruction given in *Powell* was "identical in relevant substance to the" instruction used in *Langi* and "was inadequate as applied to the crime of second degree murder because it did not clarify that an accomplice must personally harbor that mental state of implied malice."  (*Ibid.*)[9]  Because the record did not conclusively eliminate the possibility the jury found the defendant guilty by imputing malice to him, the court reversed the order denying the section 1172.6 petition and remanded for an evidentiary hearing.  (*Langi, supra*, at p. 984.)

### 4.    Analysis

Defendant asserts that, as in *Powell*, the instructions permitted the jury to find defendant guilty of second degree murder without finding defendant personally harbored malice when he aided the actual killer in commission of the life-endangering act. Defendant argues his conviction on the murder charge must be reversed because the People cannot prove this instructional error was harmless beyond a reasonable doubt. The People respond that *Powell* was wrongly decided insofar as it suggests the implied malice aiding and abetting instructions given here did not require proof of actual malice. The People assert *Powell*'s reasoning wrongly conflated the crime of murder with a theory of express malice murder, but failed to recognize murder may also be proven on a theory of implied malice.  The People contend *Langi* suffers from similarly flawed reasoning by assuming the "'unlawful purpose'" and "'intent'" in the aiding and abetting instruction must only refer to intent to kill and, further, interpreting these terms as referring to the perpetrator's motive or reason for committing the crime.

---

[9]    After *Powell* and *Langi*, the aiding and abetting instructions for implied malice murder have been found to be similarly flawed in other cases.  (See e.g., *People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1266–1267; *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 592 (*Glukhoy*).)

We need not decide if *Powell* or *Langi* were wrongly decided[10] because we conclude any instructional error was harmless beyond a reasonable doubt. Because defendant essentially argues the instruction omitted an element of the offense, the parties agree, as do we, whether this asserted error was prejudicial must be reviewed applying *Chapman*. (*People v. Hendrix* (2022) 13 Cal.5th 933, 942.) Under *Chapman*, the "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13.) This "harmlessness inquiry requires a reviewing court to 'examine[] what the jury necessarily did find and ask[] whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' [Citation.] In other words, a reviewing court must be persuaded that, in light of the jury's findings and the evidence at trial, any rational juror who made those findings would have made the additional findings necessary for a valid theory of liability, beyond a reasonable doubt, if the jury had been properly instructed. [Citation.] If the reviewing court determines beyond a reasonable doubt that any rational juror would have made the additional findings, based on the jury's actual verdict and the evidence at trial, the error is harmless because the presentation of the invalid theory to the jury made no difference. The error did not contribute to the verdict." (*In re Lopez* (2023) 14 Cal.5th 562, 589.) "'To say that an error did not contribute to the ensuing verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" (*People v. Neal* (2003) 31 Cal.4th 63, 86.)

Defendant argues the evidence he acted with implied malice under an aider and abettor theory was not overwhelming. An instructional error may be deemed harmless

---

[10] We note though that our Supreme Court has cited *Powell* and *Langi* with approval. (*Reyes, supra*, 14 Cal.5th at pp. 990–992.)

16.

where evidence of the defendant's guilt is overwhelming (*People v. Merritt, supra*, 2 Cal.5th at p. 832), but "there is no one exclusive way to determine harmlessness." (*Glukhoy, supra*, 77 Cal.App.5th at p. 593.) Evidence of defendant's guilt need not be overwhelming for the error to be found harmless. Rather, as previously stated, an instructional error is harmless beyond a reasonable doubt if the error did not contribute to the jury's verdict. (*Merritt, supra*, at pp. 827, 832.)

For defendant to be guilty as an aider and abettor of implied malice murder, the prosecution was required to prove defendant: (1) knew Luna intended to stab Torres; (2) intended to aid Luna in stabbing Torres; (3) knew the stabbing was dangerous to human life; and (4) acted with conscious disregard for human life. (*Powell, supra*, 63 Cal.App.5th at p. 713; see *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 106 ["The concept of implied malice has both a physical and a mental component."].) The "direct aider and abettor must have the same mental state as the actual perpetrator of the charged crime: the direct aider and abettor must act with knowledge that *the act* is dangerous to human life and with conscious disregard for human life." (*Glukhoy, supra*, 77 Cal.App.5th at p. 590.) "'[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a subjective standard.' [Citation.] Since rarely would a defendant provide direct evidence of that, 'implied malice may be proven by circumstantial evidence.'" (*People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 502 (*Valenzuela*).) "In short, implied malice requires a defendant's awareness of engaging in [or aiding] conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)

There was compelling evidence to support defendant's guilt as an aider and abettor of implied malice murder. Defendant was not a passive participant merely giving Luna a ride to the motel. Defendant, Luna, and Jacqueline at one point returned to the car and Jacqueline stayed at the car. Defendant could have stayed at the car as well if he only intended to give Luna a ride. Instead, defendant walked around the motel with Luna

17.

carrying a large knife protruding from his pocket trying to locate Torres's room. Defense counsel conceded during closing argument that defendant "knew, [had] probably seen" Luna carrying the knife in his pocket as they walked around. It would have been reasonable to infer defendant knew Luna had the knife in his hand as the two entered the room with defendant closely behind Luna. Defendant closed the door after him and Luna. Defendant covered Elise's mouth to stifle her screams. Defendant also pulled Elise back into the room when she tried to get out the door. By finding defendant guilty of false imprisonment, the jury necessarily found defendant intentionally restrained Elise by violence or menace.[11] This finding is not entirely consistent with defendant's assertion he had a dual purpose of restraining Elise—to reduce the risk of injury to Elise. Moreover, if, as defendant claims, defendant believed Luna only intended to intimidate Torres with the knife, defendant could have tried to intervene when Luna began stabbing Torres. Defendant not only failed to intervene, but he also prevented Elise from intervening or obtaining help by restraining her and stifling her screams. Defendant did not release Elise until she bit his hand and broke free. Alternatively, once Luna began stabbing Torres, defendant could have fled the room if he did not intend to assist Luna with a stabbing. Defendant, instead, continued to assist after Elise broke free by helping Luna struggle with Elise to obtain the murder weapon. Defendant and Luna fled together after they obtained the knife. Without defendant's assistance, Elise might have successfully intervened in the stabbing, obtained help from the neighboring motel residents, or scared Luna into leaving without inflicting harm by calling the police. Defendant's presence at the scene, his failure to prevent the stabbing of Torres or permit Elise to intervene, and his conduct before, during and after the offense show defendant intended to and by his conduct did aid and abet Luna's commission of this

---

[11] False imprisonment consists of restraining a person's freedom of movement by violence or menace. (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.)

18.

life-endangering act. (*Glukhoy, supra*, 77 Cal.App.5th at p. 599 ["presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, including flight, are relevant to determining whether a defendant aided and abetted in the commission of the crime"]; *People v. Perez* (2005) 35 Cal.4th 1219, 1225 [the aider and abettor's actus reus is "conduct by the aider and abettor that in fact assists the achievement of the crime"].)

Common sense dictates that stabbing a person with a large knife in areas of the body known to contain vital organs is dangerous to human life.[12] Luna stabbed Torres more than once inflicting the fatal wound to the pulmonary artery by a stab to the chest, an area which houses the heart and major arteries.[13] No serious argument can be made defendant did not know stabbing a person with a large knife is dangerous to human life and defendant makes no such argument on appeal. Defendant knew Luna intended to confront Torres with a dangerous weapon because Luna was holding the knife in his hand when they entered the room. Elise saw Luna stab Torres three times while being held by defendant in the small motel room. Given this close proximity, defendant presumably also saw Luna's repeated stabbing of an unarmed Torres cornered in the bathroom. (See *Valenzuela, supra*, 73 Cal.App.5th at p. 502 [malice may be inferred based on the victim's vulnerability].) Torres fell to the ground because of his wounds. Defendant

---

[12]   The "doctrine of implied malice has a 'natural and probable consequences' element," whereby "'[m]alice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.'" (*People v. Roldan* (2020) 56 Cal.App.5th 997, 1004, italics omitted, review dism., overruled on other grounds to the extent it is inconsistent with *People v. Lewis* (2021) 11 Cal.5th 952.) The natural and probable consequences element of implied malice murder is legally distinct from the natural and probable consequences doctrine of vicarious liability removed by Senate Bill 1437. (*Roldan, supra*, at pp. 1004–1005.)

[13]   Dr. Chambliss testified there are two arteries that come out of the top of the heart, including the main pulmonary artery penetrated by Luna's knife, and the "other major vessel," the aorta, which supplies blood to the body.

made no attempt to get help or help Torres himself after the stabbing and instead helped Luna obtain the knife from Elise before fleeing with Luna. (See *People v. Burden* (1977) 72 Cal.App.3d 603, 620 ["A defendant's lack of concern as to whether the victim lived or died, expressed or implied, has been found to be substantial evidence of an 'abandoned and malignant heart'"].)

We consider the prosecutor's arguments as a relevant circumstance in determining whether an instructional error was harmless. (*Powell, supra*, 63 Cal.App.5th at p. 715; *People v. Young* (2005) 34 Cal.4th 1149, 1202 ["The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury."].) *Powell* found CALCRIM No. 401 deficient in part because the instruction refers to the "*crime*" while the aider and abettor must intend to assist the perpetrator with commission of the life endangering "*act*."[14] (*Powell, supra*, at p. 714; see *Reyes, supra*, 14 Cal.5th at p. 991 ["implied malice murder requires, among other elements, proof of the aider and abettor's knowledge and intent with regard to the *direct perpetrator's* life

---

[14] After *Powell* and *Langi*, the Judicial Council created CALCRIM No. 526 for "Implied Malice Murder: Aiding and Abetting," which states, in relevant part:

"To prove that the defendant is guilty of aiding and abetting murder by acting with implied malice, the People must prove that: [¶] 1. The perpetrator committed [an] act[s] that (was/were) dangerous to human life; [¶] 2. The perpetrator's act[s] caused the death of (another person/ [or] a fetus); [¶] 3. The defendant knew that the perpetrator intended to commit the act[s] that (was/were) dangerous to human life; [¶] 4. Before or during the commission of the perpetrator's act[s], the defendant intended to aid and abet the perpetrator in committing the act[s] that (was/were) dangerous to human life; [¶] 5. Before or during the commission of perpetrator's act[s], the defendant knew the perpetrator's act[s] (was/were) dangerous to human life, and the defendant deliberately acted with conscious disregard for human life; [¶] AND [¶] 6. By words or conduct, the defendant did in fact aid and abet the perpetrator's commission of the act[s].

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] An act is *dangerous to human life* if there is a high degree of probability that the act will result in death."

endangering act"].)  As outlined above, an aider and abettor's guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and mental state.  (*McCoy*, *supra*, 25 Cal.4th at p. 1117.)  The perpetrator's actus reus "is the act that proximately causes death."  (*Powell, supra*, at p. 713, fn. 27.)  Here, the relevant act was presumably Luna's stabbing of Torres, which caused his death.  The prosecutor expressly argued to the jury defendant knew Luna was going to stab Torres and intended to assist Luna commit that "dangerous act."  The prosecutor further argued Luna "was putting that knife into … Torres, and [defendant] knew that that could cause and lead to someone's death."  The prosecutor later reiterated defendant "knows that when you stab somebody with a knife, there's a probable and likely consequence that someone's going to get hurt or someone's going to die."  Though CALCRIM No. 401 refers generally to the perpetrator's "crime," the prosecutor correctly focused the jury on the perpetrator's life-endangering act, whether defendant knowingly and intentionally assisted Luna in the commission of that act, and whether defendant acted with conscious disregard for human life.

Based on the evidence and all the relevant circumstances, we are convinced beyond a reasonable doubt the jury would have found defendant guilty of second degree murder absent the asserted instructional error.

## C.     Jury Instructions on Voluntary Manslaughter

Defendant argues the trial court erroneously instructed the jury the lesser offense of voluntary manslaughter applied only to first degree murder and not to second degree murder.

### 1.     Additional Background

The jury was instructed with a modified version of CALCRIM No. 500 as follows: "Homicide is the killing of one human being by another.  Murder and manslaughter are types of homicide.  The defendant is charged with first degree murder.  Voluntary manslaughter is a lesser offense to first degree murder.  A homicide can be lawful or

21.

unlawful. If a person kills with a legally valid excuse or justification, the killing is lawful, and he has not committed a crime. If there is no legally valid excuse or justification, the killing is unlawful, and depending on the circumstance, the person is guilty of either murder or manslaughter. You must decide whether the killing in this case was unlawful, and if so, what specific crime was committed." The instruction further stated the jury will be instructed "on what is a legally permissible excuse or justification for homicide" and "on the different types of murder and manslaughter." The jury was instructed on the elements of murder with CALCRIM No. 520 and the required findings for first degree murder with CALCRIM No. 521.

The jury was also instructed on defense of another using CALCRIM No. 571 in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect defense [of another].… [¶] … If you conclude that the defendant acted in complete defense of another, his action was lawful, and you must find him not guilty of any crime. The difference between complete defense of another and imperfect defense of another depends on whether the defendant's belief in the need to use … deadly force was reasonable." The instruction further specified the findings necessary for imperfect defense of another.

The jury was instructed with CALCRIM No. 641, in relevant part: "For Count One, charging murder, you'll be given verdict forms for guilty and not guilty of first degree murder, second degree murder and voluntary manslaughter. You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of voluntary manslaughter only if all of you have found the defendant not guilty of first degree and second degree murder."

22.

## 2. Governing Legal Principles

The trial court has a sua sponte duty to instruct on a lesser included offense supported by substantial evidence. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196.)[15] "The prejudice arising from the failure to give such instructions is the risk that the jury ignored its instructions and convicted the defendant of an offense … for which the prosecution did not carry its burden." (*Gonzalez, supra*, at p. 200.)

"California law separates criminal homicide into two classes: the greater offense of murder and the lesser offense of manslaughter." (*Schuller, supra*, 15 Cal.5th at p. 252.) The "'distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice.'" (*Ibid*.) Specifically, both first degree and second degree murder require malice aforethought. (*People v. Beltran* (2013) 56 Cal.4th 935, 942 [first degree murder is a killing committed with express malice formed willfully, deliberately and with premeditation]; *People v. Seaton* (2001) 26 Cal.4th 598, 672 [second degree murder is an unpremeditated killing with malice aforethought].) Voluntary manslaughter is an intentional, unlawful killing committed without malice aforethought, and is a lesser included offense of murder in either degree. (*People v. Rios* (2000) 23 Cal.4th 450, 461; *People v. Duff* (2014) 58 Cal.4th 527, 561; § 192.) As with imperfect self-defense, "one who kills in imperfect defense of others—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter" because he lacks the malice element required for murder. (*People v. Randle* (2005) 35 Cal.4th 987, 997 (*Randle*), overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201; see *People v. Barton* (1995) 12 Cal.4th 186, 199 [imperfect self-defense is a form of voluntary manslaughter

---

[15] Like the other alleged instructional error, defendant's claim is cognizable on appeal despite the lack of objection by defense counsel below because the trial court has a sua sponte duty to instruct the jury on lesser included offenses. Because we address the claim on the merits, we need not address defendant's alternative argument of ineffective assistance of counsel, which is premised on forfeiture.

and lesser offense to murder].)  Imperfect defense of another thus reduces both first degree and second degree murder to manslaughter.

### 3.    Analysis

Defendant argues CALCRIM No. 500 was misworded in a way that created an incorrect statement of law and invited the jury to improperly limit their application of imperfect defense of another to only first degree murder and not second degree murder. Specifically, defendant contends CALCRIM No. 500 as given to the jury was improperly modified to read:  "Voluntary Manslaughter is a lesser offense to First Degree Murder."[16] Defendant alleges this instruction mistakenly led the jury to believe voluntary manslaughter was only a lesser included offense of first degree murder and left the jury with an all-or-nothing choice of convicting defendant of second degree murder even if the jury found sufficient evidence of imperfect defense of another.  The People respond this isolated instruction is a proper statement of law because voluntary manslaughter is a lesser offense to first degree murder and the instruction does not state manslaughter is a lesser offense to *only* first degree murder.  The People further contend the instructions as a whole properly informed the jury that voluntary manslaughter is a lesser offense to both first degree and second degree murder.  The People have the better argument.

As previously stated, we review an instructional error claim de novo, including whether an instruction accurately states the law.  (*Mitchell*, *supra*, 7 Cal.5th at p. 579.) The challenged instruction correctly states voluntary manslaughter is a lesser offense to first degree murder.  The instruction did not state voluntary manslaughter is only a lesser offense to first degree murder but not second degree murder.  The instruction made no comment whatsoever about second degree murder.  The instruction did not prohibit the jury from considering whether defendant was not guilty of second degree murder but

---

[16]    The Judicial Council's pattern instruction for CALCRIM No. 500 offers the following bracketed instruction:  "Manslaughter is a lesser offense to murder."

instead guilty of voluntary manslaughter. The modified instruction thus accurately states the law.

We consider whether the modified instruction nonetheless misled the jury. The question is whether there is a reasonable likelihood the jury understood the instruction in the way defendant asserts. (*People v. Kelly* (1992) 1 Cal.4th 495, 525.) "In addressing whether a jury instruction is misleading we consider '"the entire charge of the court,"' not just a particular instruction or parts of an instruction." (*People v. Friend* (2009) 47 Cal.4th 1, 76.) We further "assume the jurors are intelligent persons capable of understanding and correlating all the instructions." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

We find no reasonable likelihood the instructions could have been understood in the manner suggested by defendant. The remaining instructions correctly informed the jury that "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect defense of another." (CALCRIM No. 571.) This instruction made no distinction between the degree of murder and negated the possibility the jurors would believe voluntary manslaughter is a lesser offense exclusively of first degree murder. The jury was also instructed a verdict of guilty or not guilty on voluntary manslaughter was acceptable only if the jury found defendant not guilty on *both* degrees of murder. This indicated voluntary manslaughter was a viable alternative to second degree murder in addition to first degree murder. Furthermore, defendant made no request for modification or clarification of CALRIM No. 500 as given by the trial court. If defendant believed the instruction required modification or clarification, it was incumbent on defendant to request it. (*People v. Kelly, supra*, 1 Cal.4th at pp. 536–537.)

In conclusion, we reject defendant's argument the trial court committed instructional error by using the modified CALCRIM No. 500.

## II.      Prosecutor's Misstatements of Law

Defendant contends the prosecutor misstated the law in closing argument by telling the jury imperfect defense of another could potentially lessen a charge of first degree murder to second degree murder. Defendant argues this prosecutorial misconduct was prejudicial and rendered the trial fundamentally unfair.

### A.      Additional Background

In the prosecutor's closing argument, he discussed the effect of a finding of imperfect self-defense in the context of a murder charge:

> "So here there's—I don't think we've got much of an argument this is a perfect self-defense case. I anticipate arguments of imperfect self-defense, which I will also be talking about. *And what imperfect self-defense is, it moves from a first degree or second degree sort of down a slot. So if you're at first degree and find imperfect self-defense, you can go to second degree murder. If you're at second degree and find imperfect self-defense, you can go to manslaughter.* But here there is no self-defense, so it is unlawful. Here, I'm going to show you that there's plenty of malice, so it's not voluntary manslaughter, and I'm going to show you malice. And malice equals murder, and murder is either first degree, which requires express malice, which I'll explain, premeditation, willful and deliberate, whereas second degree requires either express or implied malice." (Italics added.)

The prosecutor later in his argument discussed imperfect defense of another and CALCRIM No. 571:

> "But then we have [CALCRIM No.] 571. Okay. *This is imperfect defense of others, which was also read to you, and I'll also submit to you this is why this one doesn't apply. Remember, if you believe this, this would make it go from a second degree to a—to a manslaughter or from first degree to second degree.* Sorry, this one's a little smaller because there's more to it. The defendant acted in imperfect defense of another if the defendant actually believed that someone else was in imminent danger of being killed or suffering great bodily injury. It fails for the exact same reason as perfect self-defense because it still has to be imminent. And the defendant actually believed that the immediate use of deadly force was necessary to defend against that danger but at least one of those beliefs was

unreasonable.  *That's what makes it unreasonable, and that's how it downgrades a murder in the way that it does*."  (Italics added.)

While defendant's attorney did not assert defendant's guilt for manslaughter in his closing argument, Luna's attorney argued to the jury Luna was guilty of only voluntary manslaughter.  Luna's counsel discussed both imperfect self-defense and imperfect defense of another in closing argument, but specifically argued Luna's guilt under the latter theory.

During deliberations, the jury sent the following note to the trial court:  "We need clarification on 1st Degree Murder and 2nd Degree Murder.  Please come and talk to [us]. [¶]  What constitutes 1st Degree Murder and 2nd Degree Murder?"  The court returned the jury to the courtroom to respond to the question:  "If you decide that the defendants are guilty or committed murder, it is murder of the second degree.  That's where you start by default.  It's murder of the second degree unless and only if the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM instruction number 521.  Now, I'm going to go over that with you right now."  The court then reread CALCRIM No. 521 to the jury.  The court concluded by saying:  "Again, by default, it's second degree unless the People were able to prove each of the other elements beyond a reasonable doubt.  And that is, specifically, that the killing—the defendants acted willfully, deliberately and with premeditation.  They have to prove that beyond a reasonable doubt, each and every one of those elements."

The jury later sent another note to the trial court saying:  "We cannot agree whether the defendant is guilty of First Degree Murder."  The court instructed the jurors if they unanimously agree this is a case of murder, then it is murder in the second degree unless all the jurors unanimously agree the elements of first degree murder have been met beyond a reasonable doubt.  The jury confirmed this answered its question and returned to deliberations.  The jury found defendant and Luna guilty of second degree murder.

27.

## B.     Whether the Prosecutor Misstated the Law

We agree with defendant, and the People concede, the prosecutor misstated the law in his closing argument. As discussed above, imperfect self-defense and imperfect defense of another negate the element of malice for murder and reduce murder to manslaughter. The jury instructions accurately reflected this principle.[17] However, the prosecutor told the jury a finding of imperfect defense of another would reduce the murder from first degree to second degree. If the jury found defendant assisted Luna in killing Torres based on an actual but unreasonable belief he must defend Elise against imminent danger of death or great bodily injury this would not be murder—defendant would be guilty only of manslaughter. (*Randle, supra*, 35 Cal.4th at p. 997.) The prosecutor also incorrectly told the jury if it finds defendant committed murder in the "first degree and find imperfect self-defense, [the jury] can go to second degree murder." If defendant assisted Luna in killing Torres because defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the crime would reduce from murder to manslaughter, not from first degree murder to second degree murder. (*Id.* at p. 995.)

## C.     Forfeiture

The People argue defendant forfeited the prosecutorial misconduct claim by failing to object to the prosecutor's misstatements of law at trial. We agree.

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or

---

[17]     The jury was not instructed on imperfect self-defense although this theory was discussed during closing argument. A defendant charged with murder is entitled to an instruction on imperfect self-defense where substantial evidence supports the theory. (*Schuller, supra*, 15 Cal.5th at p. 243.) No evidence supported instructing the jury on imperfect self-defense in this case and defendant raises no issue on appeal regarding the omission of an imperfect self-defense instruction. While imperfect self-defense does not apply to the facts of this case, we discuss the prosecutor's misstatement of law on this theory solely to address defendant's prosecutorial misconduct claim.

28.

involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711.) "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." (*People v. Alfaro* (2009) 41 Cal.4th 1277, 1328.) The primary purpose of this requirement "'is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.'" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) A defendant will be excused from making an objection or requesting an admonition if either would be futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

The prosecutor may argue vigorously to the jury, but it is improper for the prosecutor to misstate the law to the jury. (*People v. Rivera* (2019) 7 Cal.5th 306, 337; *People v. Boyette* (2002) 29 Cal.4th 381, 435). However, a "prosecutor's misstatements of law are generally curable by an admonition from the court." (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)

Defendant did not object to the prosecutor's misstatements of law he now complains of on appeal. Defendant does not argue an objection and request for admonition by the trial court would have been futile. A timely objection would have given the trial court an opportunity to cure the prosecutor's misstatements by correctly instructing the jury on the applicable law and admonishing the jury to follow the law as instructed by the court. Nothing in the record suggests a timely objection and request for admonition could not have remedied the prosecutor's misstatements.

Defendant acknowledges he did not object to the prosecutor's misstatements, but cites section 1259 to argue the issue is preserved for appeal because it affects his substantial rights. Under section 1259, an appellate court "may … review any *instruction* given, refused or modified, even though no objection was made thereto in the lower

court, if the substantial rights of the defendant were affected thereby." (Italics added.) Section 1259 permits a defendant to challenge the correctness of a jury instruction despite the lack of objection to the instruction where the challenged instruction affected the defendant's substantial rights. (*Ibid*.; *People v. Seumanu, supra*, 61 Cal.4th at p. 1357; *People v. Hillhouse, supra*, 27 Cal.4th at p. 503.) But defendant does not challenge the correctness of the jury instruction on imperfect defense of another and, in fact, concedes the jury was correctly instructed on this theory with CALCRIM No. 571. Section 1259 does not salvage defendant's claim the prosecutor committed misconduct by misstating the law to the jury.

Defendant further contends the issue was preserved for appeal because the "cases equate substantial rights with reversible error," citing *People v. Medellin* (2020) 45 Cal.App.5th 519 (*Medellin*). In *Medellin*, the defendant was convicted on two felony assault counts (§ 245, subd. (a)(4)) with a great bodily injury enhancement (§ 12022.7) on each count. (*Medellin, supra*, at p. 523.) The defendant argued on appeal the prosecutor prejudicially misstated the law by arguing an ambiguity in the pattern jury instructions on the great bodily injury enhancements. (*Id.* at pp. 530, 533.) Specifically, the prosecutor "argued more than minor harm alone was sufficient" and the jury was instructed that "great bodily injury means 'greater than minor or moderate harm.'" (*Ibid*.) While great bodily injury requires more than moderate harm, the instruction's use of "or" permitted the jury to convict the defendant if they believed either greater than minor harm *or* greater than moderate harm is sufficient. (*Id.* at pp. 533–534.) A majority of this court concluded the "prosecutor's misstatement alone is insufficient to reverse" the defendant's convictions (*id.* at p. 533), but the prosecutor's erroneous argument together with the instructional ambiguity were prejudicial and required reversal (*id.* at pp. 534–536).

Here, defendant argues the prosecutor's misstatement about imperfect defense of another compounded the alleged erroneous instruction "implying that imperfect defense

of others only applied to *first*-degree murder …." We have already concluded the modified CALCRIM No. 500 correctly stated the law and there is no reasonable likelihood the instructions misled the jury to believe voluntary manslaughter was restricted to only first degree murder. *Medellin* is thus distinguishable because the prosecutor's misstatement of law was not compounded by an ambiguous and incorrect instruction.

In a footnote in *Medellin*, the majority rejected the People's argument the defendant had forfeited his claim by failing to object in the trial court and cited section 1259 and three cases in support of its conclusion the issue was preserved. (*Medellin, supra*, 45 Cal.App.5th at p. 530, fn. 7.)[18] In two of the cases cited in the *Medellin* footnote, the appellate court considered the issue preserved despite the failure to object where the defendant challenged an instructional error that substantially affected the defendant's rights pursuant to section 1259. (*People v. Stringer* (2019) 41 Cal.App.5th 974, 981, fn. 2 [the defendant's claim the instruction misstated the law governing aggravated kidnapping was preserved despite no objection]; *People v. Velasquez* (2012) 211 Cal.App.4th 1170, 1177, fn. 5 [the defendant's instructional error claim was preserved because the jury may have found the defendant guilty even though the prosecution failed to prove all elements of the offense].) In the third case, *People v. Christopher* (2006) 137 Cal.App.4th 418, the appellate court acknowledged an unpreserved instructional error claim is not forfeited if the defendant's substantial rights are affected, but concluded the defendant's claim was forfeited because he failed to demonstrate the error resulted in a miscarriage of justice. (*Id.* at pp. 425–429.) All three cases involved claims of instructional error and the issue was therefore preserved for appeal if the alleged error affected the defendant's substantial rights. None of these cases

---

[18] As previously discussed, section 1259 does not relieve defendant of the obligation to object to the prosecutor's misstatements of law to preserve his prosecutorial misconduct claim.

31.

found that a prosecutorial misconduct claim standing alone is not subject to forfeiture despite the defendant's failure to object, nor can they be broadly read as holding that *any* error that affects a defendant's substantial rights is not subject to forfeiture. (See *People v. McCullough* (2013) 56 Cal.4th 589, 593 [a constitutional right may be forfeited by failure to assert the right before the tribunal with jurisdiction to determine it]; accord, *United States v. Olano* (1993) 507 U.S. 725, 731–732.)

## D.    Prejudice

Although defendant's prosecutorial misconduct claim was forfeited, we consider whether the prosecutor's misstatements of law were prejudicial.

Defendant argues the *Chapman* standard of prejudice applies because the misconduct violated a federal right.[19] We disagree. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) The prosecutor's two isolated misstatements of law in closing argument cannot plausibly be characterized as infecting the trial with such unfairness that defendant was denied due process in violation of federal law. Moreover, our Supreme Court has applied the *Watson* standard to prosecutorial misconduct claims, including claims the prosecutor misstated the law to the jury. (*People v. Powell* (2018) 5 Cal.5th 921, 951; *People v. Peoples* (2016) 62 Cal.4th 718, 797–799; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Under this standard, we ask whether it is reasonably probable a more favorable result for the defendant would have occurred absent the misconduct.

---

[19]    The People do not specifically argue which standard applies and instead argue the error is harmless under any standard.

Defendant claims it is reasonably probable he would have been convicted of manslaughter rather than murder absent the prosecutor's error. This contention is unpersuasive. There is a dearth of evidence demonstrating defendant acted in imperfect defense of Elise. Elise was Luna's cousin and Luna claimed he went to the motel in part to get Elise and the kids. But there is no evidence defendant had ever met Elise before the stabbing or had any reason to protect her from Torres. On the contrary, defendant's violent physical restraint of Elise during the stabbing is inconsistent with an intent to protect her. While Torres had a history of abusing Elise, nothing in the evidence shows Elise was in imminent danger of being killed or suffering great bodily injury when defendant and Luna entered the room. Torres was unarmed, alone in the bathroom, and apologetic to Luna when confronted. Defendant's attorney did not even argue to the jury that defendant acted in imperfect defense of Elise, presumably recognizing the weakness of the evidence in support of that theory.

Defendant argues the prosecutor's misstatements suggested to the jury it could use the same facts for imperfect defense of another to reduce the degree of the murder. Even if we accept this premise, the prosecutor's misstatements of law were brief and countered by jury instructions that correctly outlined the law regarding imperfect defense of another. "'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." [Citation.]'" (*People v. Centeno, supra*, 60 Cal.4th at p. 676.) The jury was specifically instructed a killing that would be murder is reduced to voluntary manslaughter if the defendant acted in imperfect defense of another. The jury was further instructed with CALCRIM No. 200 to follow the law as explained by the court and if they "believe that the attorneys' comments on the law conflict with [the court's] instructions, [they] must follow [the court's] instructions." In his closing argument, the prosecutor similarly told

33.

the jury to follow the court's instructions on the law if they conflict with what he says.[20] We presume the jury followed the court's instructions in the absence of any evidence to the contrary. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 821.)

Defendant argues the jury's questions during deliberations show they struggled over whether the crime was first or second degree murder, and claims it was "quite possible" the jury was struggling with whether Luna and defendant acted in defense of Elise, not with premeditation and deliberation. This contention is entirely speculative. Defendant fails to demonstrate "a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion" and nothing in the record indicates the jury did not follow the correct law as instructed by the trial court. (*People v. Morales, supra*, 25 Cal.4th at p. 44.)

We conclude there is no reasonable probability defendant would have received a more favorable result absent the prosecutor's misstatements of law.[21]

## III.    Asserted Judicial Misconduct

Defendant contends the trial court committed prejudicial misconduct by adding improper commentary bolstering the prosecution when overruling defense counsel's objection to part of the prosecutor's closing argument.

---

[20]    The prosecutor stated toward the beginning of his argument: "It's my job to sort of guide you through [the jury instructions] and explain how the facts relate to the jury instructions, but if any of mine are different than what the Court provided you and what the Court is going to provide you copies of what you had yesterday, if any of mine are different, always remember the Court is right. The Court is right on the law." The prosecutor later reiterated: "Follow the law as the Judge instructs. And again, I put this in there because I need it for the record in case anything about my law is wrong or different than what you received by [the] Judge, remember the Judge is always right. Follow the Judge's instructions."

[21]    Because we address the merits of the prosecutorial misconduct claim, we need not address defendant's alternative argument of ineffective assistance of counsel claim, which is premised on forfeiture. Furthermore, since we conclude the error was not prejudicial, we necessarily reject defendant's ineffective assistance of counsel claim to the extent he argues counsel's performance was also deficient for failing to object to the prosecutor's misstatements of law. (See e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 249 [no ineffective assistance of counsel where there is no reasonable probability of a different outcome absent the error].)

## A.     Additional Background

Defense counsel argued during his closing statement that defendant's acts did not show malice aforethought because his acts did not endanger Torres's life: "Giving a ride to [the] motel. Do we have evidence that what was discussed, what [defendant] knew? No. Looking for room 223 with Luna. Again, as I—as I argue—argue to you that he doesn't know where Hector is. He doesn't know [where] Elise is. So he's not actively looking for the room. He's just following him, Luna around, following to [the] room, and now here, [the prosecutor] said that this shows his malice aforethought. Okay. I'm going to get into it, but one of the elements of the malice aforethought is that the natural, probable cause—consequence of that action is dangerous to one's life. That's the element—second element malice aforethought. And I'll tell you why that doesn't meet. Because Mr. Luna already had drawn [the] knife. He was aware of what he was going to do. Mr. Torres is trapped like a sitting duck in a small bathroom. There's no way to get out. Mr. Luna opened the door, he blocks the view from where [defendant] and Ms. Elise, and he's going to anyway, he didn't even need [defendant]. [Defendant] was irrelevant, just a guy [who] was his ride. So [the] prosecutor makes [a] big deal of [defendant] closing the door as if there's malice aforethought. That did not endanger Hector Torres's life."

During the prosecutor's rebuttal, the following exchange took place:

> "[PROSECUTOR]: So again, for the implied malice, this is the same one I showed you earlier, he intentionally—this is for second degree murder. He intentionally committed an act, the natural and probable consequence of that act was dangerous to human life. So the act, again, is stabbing.It's—it goes to the perpetrator and the aiding and abetting theory that I already put forth. And stabbing someone in the chest is the natural and probable consequence of that is dangerous to human life. At the time he acted, he knew his act was dangerous to human life, and he deliberately acted with conscious disregard for human life. So in order to find [defendant] guilty of the aiding and abetting, this is what I'm suggesting to you that Mr.—at the very least, … Luna's mind-set was at, and that's what he knew because he saw … Luna stabbing this guy in the chest, all the

while he was aiding and abetting in the murder. I do not have to show that they were communicating. I just have to prove that he knew what … Luna—just have to prove he knew what the intent of … Luna was. It's not my requirement to show [defendant] had to do—had to do—again, this is back to the aiding and abetting, that he had to do anything that was dangerous to human life.

"[DEFENSE COUNSEL]: Objection. Misstates the law.

"THE COURT: Overruled. That is a completely accurate statement of the law that [the prosecutor] has provided, and the Court noticed that it was a misstatement of the law during the course of [defense counsel's] presentation, but I thought it was an oversight. So ladies and gentlemen, again, you will have six copies of the instructions, and you can look them up, and you'll see for yourself, and then you can make the determination. Objection's overruled."

After the prosecutor finished his rebuttal, the trial court excused the jury for the day due to the lateness of the hour. The following colloquy then took place outside the jury's presence:

"[DEFENSE COUNSEL]: Judge, [the] Court has indicated to [the] jury that I misstated the law.

"THE COURT: You did.

"[DEFENSE COUNSEL]: You made a comment.

"THE COURT: You did.

"[DEFENSE COUNSEL]: Now, let me finish, please.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: [CALCRIM No.] 520 describes malice aforethought, and what I said is, 'It says, defendant—defendant—malice aforethought imply defendant intentionally failed to act, natural and probable cause of the act was dangerous to life. At that time defendant acted, he was—he knew his act was dangerous to life. The defendant deliberately acted with conscious disregard for life—disregard for human's life,' and that's what I argued off. Now, [the] prosecutor stated that number two does not—number two does not apply to defendant Embrey. I don't see any case law that says that.

36.

"THE COURT: I have case law that says it.

"[DEFENSE COUNSEL]: Okay.

"THE COURT: Any time you're dealing with an aiding and abetting, when you have a specific intent crime the, aider and abetter [*sic*] share the requisite specific intent of the perpetrator. In other words, an aider and abetter [*sic*] share the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of that crime. So it has nothing to do with [defendant] committing an act that is—the natural and probable consequence is dangerous to human life. That's not the analysis. He has—if—the analysis goes to … Luna because he was—he was the perpetrator. All he has to do in terms of [defendant] is hit those four elements with respect to aiding and abetting. He is assumed to have the same intent as the other individual, the perpetrator. He gets that intent. So for you to tell the jurors the fact that he opened the door, that was not a natural and probable consequence of a dangerous act, that's a misstatement of the law. That's a misstatement of the law. There was no objection, so I didn't say anything.

"[DEFENSE COUNSEL]: Well—

"THE COURT: When you objected to [the prosecutor], I clarified, and I pointed out the fact that when you said that, that was a misstatement of the law.

"[DEFENSE COUNSEL]: When I said [defendant's] action natural and—natural and probable consequence.

"THE COURT: What I was referring to, [defense counsel], was when you said that he had opened up that door or trying to close the door, uh, was not—um you can't be guilty because that did not constitute, um, a natural and probable consequence that would be dangerous in light, and so forth and so on. Do you see what I'm saying? And that's not the law.

"[DEFENSE COUNSEL]: Okay. I'm asking you to do this: I'm asking you to read the instruction that your comments has no bearing on their deliberation. All you have to do is overrule. Instead, you corrected I misstate the law, implying that I misled the jury.

"THE COURT: You said that [the prosecutor] misstated the law.

"[DEFENSE COUNSEL]: Right.

"THE COURT: And I said that his interpretation was correct and yours was wrong. You had misstated during your argument, and that's the—that's the truth.

"[DEFENSE COUNSEL]: Well, then he didn't object when I made an argument.

"THE COURT: And I didn't say that. I said—

"[DEFENSE COUNSEL]: So what I wish [the] Court had done was overruled instead of making—injecting [the] Court's own comments, and that prejudice[s] my client. Now the jury thinks that I'm trying to fake them, misleading them.

"THE COURT: No, you said—okay. You said that [the prosecutor] was misstating the law when you were the one who misstated the law.

"[DEFENSE COUNSEL]: And that was legal objection. That was legal ground objection, and all [the] Court has to do was overrule and we can move on.

"THE COURT: Okay. Well, you have a record.

"[DEFENSE COUNSEL]: Well, I'm asking the Court to give them instruction that comment that you made during the closing argument has no bearing—or during the trial has no bearing—should have no bearing on the jury's determination. I'm asking the instruction to be given to them because you certainly made a comment stating that, '[the prosecutor's] right, and you are wrong,' basically that's the Court has said in front of the jury, and that—that hugely discredits my client. For you to make the comment it's—it's one thing for [the prosecutor] to make comment as an adversary counsel, but it's another thing to—that [the] Court—I mean, you are the giver of the law, and I'm assuming, and I'm pretty sure my suspicion's right, that they have tremendous respect for your decision and your comment. [The] Court is the giver of the law. When the Court makes a comment that I made—I misstate the law, and he made a right statement of the law, even though you may be right, Your Honor, all I'm saying is that has a huge implication on the minds of the jury. Now [the] jury's going home thinking that [defense counsel] was misleading us, and I think that— that substantially prejudices my client, and that's—so all I'm asking, Judge, is that if he's right, that's fine, leave it at that, but I'm asking the Court to give them instructions that whatever the comments you have made during the trial should have no bearing.

38.

"THE COURT:  I have no problem doing that because there's already an instruction that says that, but given the fact that I gave that instruction, and we had this conversation, subsequent to that, I have no problem doing that.

"[DEFENSE COUNSEL]:  Thank you very much, Your Honor. That's all I'm asking.

"THE COURT:  But like I said before, as soon as you said that, I knew that was a misstatement of the law.

"[DEFENSE COUNSEL]:  But [the prosecutor] also argue[d] that off that on my comment of malice aforethought.  He argue[d] off it, so I that's why I—I have to respond.  He didn't argue off—if he didn't say anything about malice aforethought against my client, I would have be quiet because then I would know that his theory is aiding and abetting, and I knew how to argue against aiding and abetting, but he also went through malice aforethought, and that I had to respond.

"THE COURT:  Okay.

"[DEFENSE COUNSEL]:  I wasn't going to argue it, but I thought his theory all along was aiding and abetting.  That that was my understanding the whole process because it was so—

"THE COURT:  Right.

"[DEFENSE COUNSEL]:  —but once he gets into malice aforethought, I have to respond something to that his actions do not cause any danger to human life, and that's all I did, Your Honor, and I apologize if [the] +Court thinks that I misstated the law, but all I'm asking the Court to admonish jurors not to consider your statement or comments about defendants in terms of making mistake and prosecutor is right.  I think that's huge implication in my opinion, and I know [the] Court didn't mean to prejudice defense intentionally, but I think there is some implication, and that's all I'm asking.

"THE COURT:  Okay.  [Defense counsel], I told you I'm giving the instruction.  Okay."

Defense counsel reviewed the cases provided by the trial court and subsequently conceded the court was right and he was in the wrong about the law.  Defendant filed a motion for mistrial based on the court's comment.  The court denied this motion.

39.

When the jurors returned to the courtroom the following day, the trial court instructed the jury as follows: "During [the prosecutor's] rebuttal argument yesterday [defense counsel] objected on the grounds that [the prosecutor] misstated the law. The court overruled the objection and noted that [the prosecutor's] interpretation of the law was correct. The court noted further that [defense counsel] misstated the law on this issue during his closing argument. You are instructed to totally disregard the court's comments on this issue. And you are not to consider them for any purpose. [¶] Again, what the attorneys say during questioning and/or argument does not constitute evidence or the law. The court has provided you with the law that you are to apply to the facts as you find them."

## B. Governing Legal Principles

"Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233 (*Sturm*).) "Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.'" (*Id.* at p. 1237.) A trial court commits misconduct if the trial judge "creates the impression that he is allied with the prosecution" (*id.* at p. 1242) or "'"persists in making discourteous and disparaging remarks to a defendant's counsel ….."'" (*Id.* at p. 1238.)

We "evaluate the propriety of judicial comment on a case-by-case basis …." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 770.) The "trial court has broad latitude in fair commentary, so long as it does not effectively control the verdict." (*Id.* at p. 768.) The "court may not express its views on the ultimate issue of guilt or innocence or otherwise 'usurp the jury's exclusive function as the arbiter of questions of fact and the credibility of witnesses'. [Citation.] The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made." (*People v. Melton* (1988) 44 Cal.3d 713, 735.) Our role "'is not to determine whether the

trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.'" (*People v. Snow* (2003) 30 Cal.4th 43, 78.)

### C. Analysis

Defendant argues the trial court's commentary improperly discredited defense counsel and bolstered the prosecution. Defendant contends that although the comments were brief, they essentially discredited the entirety of defense counsel's closing argument while crediting that of the prosecutor.

"As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial." (*Sturm, supra*, 37 Cal.4th at p. 1237.) The People do not argue defendant forfeited his judicial misconduct claim by failing to object and acknowledge defense counsel objected at the first opportunity outside the jury's presence, requested a curative admonition and moved for a mistrial. Defendant similarly argues the claim is preserved for appeal because defense counsel may have had tactical reasons for waiting to object until after the jury was excused and timely made an objection outside the jury's presence. We agree the issue was preserved by defense counsel.**22** Specifically, defense counsel lodged his objection to the comment just after the court excused the jury, asked the court for a curative admonition to the jury, and timely filed a motion for mistrial.

Although the claim was not forfeited, we find the trial court's comment was proper. As previously discussed, "[t]o be culpable as a direct aider and abettor of implied malice murder, the accomplice 'must, by words or conduct, aid the commission of the life-endangering *act.*' [Citation.] Thus, the aider and abettor's actus reus 'includes

---

**22** Because the claim was not forfeited, we address it on the merits and need not address defendant's alternative argument of ineffective assistance of counsel, which is premised on forfeiture.

41.

whatever acts constitute aiding the commission of the life endangering act.'" (*Glukhoy, supra*, 77 Cal.App.5th at p. 588, quoting *Powell, supra*, 63 Cal.App.5th at p. 713.) In his closing statement, defense counsel argued defendant's conduct did not show malice aforethought because defendant's acts were not dangerous to human life. The prosecutor argued in rebuttal he was not required to show defendant himself committed an act that was dangerous to human life. In overruling defense counsel's objection, the trial court confirmed the prosecutor had accurately stated the law on aiding and abetting an implied malice murder and informed the jury defense counsel had misstated the law during his statement. This comment falls within the court's role to ensure the jury understood the law correctly. (*People v. Price* (1991) 1 Cal.4th 324, 442 [the trial court has a duty to instruct the jury on the general principles of law governing the case], superseded on another ground by statute as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161–1165.) It is not misconduct for the court "to clear up possible jury confusion, which is a judicial function." (*People v. Linwood* (2003) 105 Cal.App.4th 59, 74 [no judicial misconduct where the trial court clarified to the jury what acts were applicable to which counts].) Clarifying the correct law to the jury may fairly include noting defense counsel had misstated the law. The court's comment is not reasonably interpreted as discrediting the entirety of defense counsel's closing argument when the comment was directed at defense counsel's discussion of whether defendant committed the requisite actus reus for accomplice liability.

We are equally unpersuaded by defendant's argument the trial court's comment was prejudicial because of the "related" instructional error on the elements of aiding and abetting an implied malice murder. Defendant challenged the aiding and abetting instruction based on the alleged failure to instruct the jury defendant must have personally possessed malice aforethought, the mens rea of murder. The relevant point of contention addressed by the court during the parties' closing arguments was an aider and abettor's requisite actus reus, i.e., whether the prosecution was required to show

defendant committed an act dangerous to human life. Rather than compounding any instructional error about an aider and abettor's requisite mens rea, the court clarified to the jury the necessary actus reus to find defendant guilty under an aiding and abetting theory. This was not "related" to any instructional error on the necessary mens rea as asserted by defendant.

We further reject defendant's contentions the trial court's comment gave an improper appearance of advocacy, breached the court's duty to remain neutral, or "essentially directed the verdict." The court did not disparage defense counsel or praise the prosecutor in its comment, nor did the court indicate defense counsel was acting in an underhanded or unethical manner during his closing argument. (Cf. *Sturm, supra*, 37 Cal.4th at pp. 1240–1241 [the trial court committed misconduct by repeatedly disparaging defense counsel in front of the jury].) While the court may comment on the evidence (*id.* at p. 1239; Cal. Const. Art. VI, § 10), the court did not discuss any of the evidence or comment on defendant's guilt.[23] The court did not expressly or impliedly tell the jury to find defendant guilty of murder. The court told the jury they can "see for [themselves]" the correct law as they would have several sets of the jury instructions and can then "make the determination." The court explicitly left the question of defendant's guilt in the jury's hands.

Defendant argues the trial court's comment was prejudicial by relying in part on the colloquy between the court and defense counsel *after* the jury was excused. Even if we deemed the court's subsequent exchange with defense counsel improper, this could not have prejudiced defendant because it occurred outside the jury's presence. (*People v. Woodruff* (2018) 5 Cal.5th 697, 770.)

---

[23]     Defendant's citation of *People v. Tatum* (2016) 4 Cal.App.5th 1125 is inapposite. In that case, the trial court improperly usurped the jury's role of determining witness credibility when the court made extended remarks to the jury that plumbers are liars and the defendant's alibi witness was a plumbing contractor. (*Id.* at pp. 1130–1131.) Here, by contrast, the court did not discuss the evidence or the credibility of any witnesses.

Moreover, at defense counsel's request, the trial court admonished the jury to totally disregard the court's commentary. The jury was also instructed with CALCRIM No. 101 not to take anything the court says or does during the trial as an indication of what the court thinks about the facts, the witnesses, or what the verdict should be. "Jurors are presumed to follow a court's admonitions and instructions." (*People v. Houston* (2005) 130 Cal.App.4th 279, 312.) The court's admonition was sufficient to cure any potential prejudice from the court's comment and the court properly denied defendant's related motion for mistrial. (*People v. Harris* (2013) 57 Cal.4th 804, 848 [the trial court should grant a motion for mistrial if an incident is incurably prejudicial].) Defendant fails to show the court's brief and isolated comment denied his right to a fair trial.

## IV.    Cumulative Error

Defendant argues reversal of his conviction and a new trial is required because it is reasonably probable that, but for the aggregate effect of the alleged errors, the outcome of the trial would have been different.

"Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) "The 'litmus test' for cumulative error 'is whether [the] defendant received due process and a fair trial.'" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) We have rejected defendant's individual claims of error or determined any error was not prejudicial. We are satisfied based on our review of the record defendant received a fair trial. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [a criminal defendant is "entitled to a fair trial but not a perfect one"].)

## DISPOSITION

The judgment is affirmed.

MEEHAN, J.

WE CONCUR:

LEVY, Acting P. J.

PEÑA, J.